UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
                                                        :
UNITED STATES OF AMERICA,                               :
                                                        :
                    - against -                         :
                                                        :           24-CR-370 (VSB)
SAM GLOVER,                                              :
                                                        :           **OPINION & ORDER**
                                     Defendant.          :
                                                        :
------------------------------------------------------------X

<u>VERNON S. BRODERICK, United States District Judge</u>:

 Trial in this matter is scheduled to begin on June 16, 2025.  Pending before me are the parties' motions *in limine*.  For the reasons that follow:

1. The Government's motion *in limine* is GRANTED IN PART and DENIED IN PART:

   a. The motion to admit evidence of Glover's prior uncharged conduct is GRANTED as to (1) the Ponazuril and the Pain Medication, and (2) the 2015 FDA Investigation. With regard to the state board of pharmacy violations and the sales to the California customer, the motion is DENIED at this time, but will be considered at the final pretrial conference.

   b. The motion to preclude evidence of Glover's prior lawful conduct is GRANTED with regard to conduct outside the scope of the charged conspiracy.

   c. The motion to preclude evidence or argument regarding the Government's exercise of its prosecutorial discretion, including its motives for this prosecution, is DENIED as moot.

    d.   The motion to preclude evidence of Glover's personal circumstances and his potential punishment is DENIED as to Glover's family ties to U.S. Compounding, Inc. ("USC") and is GRANTED in all other respects.

    e.   The motion to admit Glover's co-conspirators' statements in furtherance of the conspiracy is DENIED without prejudice to eliciting such statements at trial upon establishing a foundation.

    f.   The motion to admit the drug purchase orders is GRANTED as to Exhibit A and is DENIED without prejudice to introducing other such orders at trial subject to any specific objections.

2.   Glover's motion *in limine* is GRANTED IN PART and DENIED IN PART:

    a.   The motion to preclude evidence of Glover's prior uncharged conduct is DENIED as to the Ponazuril and the Pain Medication and is GRANTED as to the 2015 FDA Investigation.  With regard to the state board of pharmacy violations and the sales to the California customer, the motion is GRANTED at this time, but this category of evidence will be considered at the final pretrial conference.  The motion is DENIED as to Glover's purported agreements with other veterinarians.

    b.   The motion to preclude the use of the words "illegal," "scheme," "sham," or "kickbacks" is DENIED.

    c.   The motion to preclude evidence of USC's bankruptcy is DENIED as moot.

    d.   The motion to preclude introduction of USC's corporate compliance policy is DENIED.

    e.   The motion to preclude the expert witness testimony of Dr. Mongeluzzi (the "Expert") is DENIED.

    f.   The motion to preclude the use of summary charts and witnesses is DENIED as

moot.

## I.   **Background**[1]

Defendant Sam Glover ("Glover" or "Defendant") worked at USC, a drug compounding

company, from approximately 2010 to 2021, serving as the company's Vice President of Sales

from "at least" 2015 until mid-2021.  (Doc. 2 ("Indictment") ¶ 3; *see also* Doc. 32 ("Def. Mot.")

1–2.)  "Drug compounding is the process of combining, mixing, or altering ingredients to create

a medication tailored to the needs of an individual, animal or a small group of animals."  (Def.

Mot. 1.)  Glover "oversaw the development of sales for [USC]'s veterinary and animal

medications."  (*Id.* 2.)  USC, located in Arkansas, was owned by Glover's father, and employed

both Glover and his sister.  (*See* Doc. 29 ("Gov't Mot.") 3; Def. Mot. 1–2.)  When Glover joined

USC in 2010, it was privately held.  (*See* Def. Mot. 1.)  In 2016, USC was acquired by Adamis

Pharmaceuticals Corporation ("Adamis"), a publicly traded company.[2]  (Indictment ¶ 3.)

On July 9, 2024, an Indictment was unsealed charging Glover—in connection with his

role at USC—with participating in a conspiracy to distribute an adulterated or misbranded[3]

equine drug (the "Drug") with intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a)

and 333(a)(2).  (Indictment ¶¶ 1–7.)  The Indictment alleges that Glover conspired with a

Kentucky-based veterinarian (the "Veterinarian") by paying the Veterinarian to prescribe the

---

[1] The following factual background is drawn from the Indictment, (Doc. 2 ("Indictment")), and is supplemented with details from the parties' submissions.  This background is intended to be a brief overview, and further factual detail is provided as necessary *infra* §§ III and IV.  The facts in the Indictment are solely allegations, and nothing in this Opinion & Order should be construed as a factual finding.

[2] Adamis merged with DMK Pharmaceuticals ("DMK"), a privately held company, in May 2023.  (Def. Mot. 3.) The successor corporate entity, DMK, and its subsidiaries filed for bankruptcy in February 2024.  (*Id.*)

[3] A drug is "adulterated" or "misbranded" within the meaning of these statutes if it requires a prescription and "is administered without a valid prescription, that is, not in the usual course of a veterinarian's professional practice, or not administered pursuant to any prescription at all."  (Indictment ¶ 2.)

Drug to horses the Veterinarian had not seen.  (*Id*. ¶ 3.)  The technical requirement is that a prescription must be issued pursuant to a valid veterinarian-client-patient relationship ("VCPR"). (Gov't Mot. 3.)  These fabricated prescriptions would result in Drug orders for USC to compound, fill, and ship, thereby enhancing USC's revenue.  (Indictment ¶¶ 3–4.)  After Adamis acquired USC, Glover conspired with others to conceal the kickback arrangement with the Veterinarian by designating the Veterinarian as a consultant to USC.  (*See id*.)  In fact, the Veterinarian "received a commission based on the volume of sales for invalidly prescribed doses of the Drug, and the payments issued by Adamis were compensation for the fraudulent [prescriptions]."  (*Id*. ¶ 4.)

Glover was arraigned on July 19, 2024, and was released on a $75,000 personal recognizance bond the same day.  (*See* Docs. 11–14.)  Trial is scheduled to begin on June 16, 2025.  (*See* Doc. 18.)

On May 14, 2025, the Government and Defendant each filed motions *in limine* (*see* Doc. 29 (Government's motion); Doc. 30 (Defendant's motion)), along with supporting memoranda and exhibits under seal.  On May 21, 2025, the Government, (Doc. 33 ("Gov't Opp'n")), and Defendant, (Doc. 34 ("Def. Opp'n")), filed opposition briefs to the respective motions.[4]

## II.    Applicable Law

### A.  *Motion in Limine*

"The purpose of an *in limine* motion is to aid the trial process by enabling the Court to rule in advance of trial on the relevance of certain forecasted evidence, as to issues that are definitely set for trial, without lengthy argument at, or interruption of, the trial."  *Doe v. Lima*,

---

[4] The Government's opposition brief on one page refers to "Defendant's first and third motions," but cites throughout only Glover's motion filed May 14, 2025.  (Gov't Opp'n 2.)  I will disregard the reference to the "third motion[]."

No. 14-CV-2953, 2020 WL 4731418, at *3 (S.D.N.Y. Aug. 14, 2020) (internal quotation marks omitted). "Where a movant fails to set forth, with sufficient particularity, the forecasted evidence for which preclusion is sought, a court has discretion to deny the motion or reserve judgment." *Walia v. Napolitano*, No. 11-CV-2512, 2017 WL 10378189, at *2 (E.D.N.Y. Dec. 4, 2017) (citations omitted). "[E]videntiary rulings made in advance of trial are subject to change based on whether an appropriate foundation can in fact be laid for certain evidence, and the many variables that occur during the course of a trial that may impact a court's ruling at the time evidence is offered." *United States v. Mostafa*, 16 F. Supp. 3d 236, 248 n.1 (S.D.N.Y. 2014); *accord Luce v. United States*, 469 U.S. 38, 41 (1984) ("The ruling is subject to change when the case unfolds, particularly if the actual testimony differs from what was contained in the defendant's proffer.").

### B. *Federal Rules of Evidence*

Pursuant to Federal Rule of Evidence 401, evidence is "relevant" if "it has any tendency to make a fact more or less probable than it would be without the evidence" and that fact "is of consequence in determining the action." Fed. R. Evid. 401. If evidence is not relevant, it is not admissible. Fed. R. Evid. 402. Rule 403 authorizes a court to exclude relevant evidence "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

Federal Rule of Evidence 404(b)(1) prevents the introduction of "[e]vidence of any other crime, wrong, or act . . . to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." However, the same evidence may be introduced for other purposes, including to demonstrate "motive, opportunity, intent,

preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2). Indeed, under the Second Circuit's "inclusionary approach," evidence in the scope of Rule 404(b) may be "admitted for any purpose other than to demonstrate criminal propensity." *United States v. Zhong*, 26 F.4th 536, 551 (2d Cir. 2022) (internal quotation marks omitted). Additionally, "evidence of uncharged criminal activity is not considered 'other crimes' evidence" under Rule 404(b) "'if it arose out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial.'" *United States v. Kaiser*, 609 F.3d 556, 570 (2d Cir. 2010) (quoting *United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000)). Finally, prior-bad-act evidence offered for these permissible purposes may be admitted "only if it 'satisfies the probative-prejudice balancing test of Rule 403 of the Federal Rules of Evidence.'" *Zhong*, 26 F.4th at 551–52 (quoting *United States v. Greer,* 631 F.3d 608, 614 (2d Cir. 2011)).

"Hearsay is any out-of-court statement offered to prove the truth of the matter asserted in the statement." *Porter v. Quarantillo*, 722 F.3d 94, 97 (2d Cir. 2013) (citing Fed. R. Evid. 801(c)). Federal Rule of Evidence 802 provides that hearsay "is not admissible" unless an exception is available in a federal statute, the Federal Rules of Evidence, or "other rules prescribed by the Supreme Court." As relevant to the present motions, Rule 801(d)(2)(E) provides that an out-of-court statement "offered against an opposing party" that is "made by the party's coconspirator during and in furtherance of the conspiracy" is not hearsay.

I discuss other of the applicable Federal Rules of Evidence as relevant *infra*.

### III.    <u>Discussion</u>

#### A.  *Prior Uncharged Conduct*

The Government seeks to introduce evidence at trial that on several instances, Glover "was made aware that distributing USC's compounded medications in a particular manner was illegal."  (Gov't Mot. 6.)  The Government argues that this evidence is admissible either (A) "as direct proof that [Glover] was on notice of regulations governing the distribution of USC's compounded pharmaceutical products" and therefore "explains [Glover's] affirmative steps to engage in, conceal, and adapt the scheme charged in the Indictment," or (B) "under Rule 404(b) to show [Glover's] knowledge, intent, absence of mistake, motive, and lack of accident."  (*Id*. 6–7.)  Defendant opposes the Government's request to deem this evidence admissible, (Def. Opp'n 2–5), and the Defense's motion *in limine* seeks the exclusion of this evidence during trial, (Def. Mot. 19–34).

As an initial matter, Defendant argues that the Government's notice of its intent to use this evidence at trial was insufficient.  (Def. Mot. 18–19.)  This contention is without merit.  Federal Rule of Evidence 404(b)(3) provides that in a criminal prosecution, the Government must, "in writing," "provide reasonable notice of [Rule 404(b)] evidence that the prosecutor intends to offer at trial" and "articulate in the notice the permitted purpose for which the prosecutor intends to offer the evidence and the reasoning that supports the purpose."

There is no dispute that the Government provided notice of the categories of Rule 404(b) evidence in a written letter dated May 9, 2025.  (*See* Ex. A. to Def. Mot.)  However, Defendant claims that the Government's letter was insufficient because it provided "no details" and only a cursory "explanation . . . as to why these categories of evidence are admissible under 404(b)."  (Def. Mot. 19.)  To the extent the letter lacked clarity, the Government's motion *in limine* filed on

May 14, 2025 contained more details and a more precise discussion of its reasoning for the admissibility of the evidence.  (*See* Gov't Mot. 6–17.)  Courts have held that the Government may satisfy Rule 404(b)(3) by providing its 404(b) notice in a motion *in limine*, *United States v. Priolo*, No. 2:21-CR-566, 2025 WL 679413, at *17 (E.D.N.Y. Mar. 4, 2025), and that in any case notice must be filed "at least ten business days" prior to trial, *United States v. Gillier*, No. 11-CR-409, 2022 WL 179204, at *4 (S.D.N.Y. Jan. 19, 2022).  The Government's notice complied with these requirements.

I next address each category of uncharged conduct in turn.

### 1.  State Board of Pharmacy Violations

USC faced various state board-of-pharmacy disciplinary actions over the course of Glover's employment at USC.  The Government seeks to introduce evidence of the following state board-of-pharmacy enforcement proceedings:  (1) in 2014, Colorado "disciplined USC for distributing drugs without patient-specific prescriptions," and Michigan "instituted reciprocal proceedings"; (2) in 2015, Minnesota "disciplined USC for compounding and distributing prescription drugs without patient-specific prescriptions"; and (3) in 2019, Maryland "instituted disciplinary proceedings against USC for dispensing drugs wholesale without a wholesale drug distributor permit and without a valid prescription, and for distributing drugs into [Maryland] during periods of time when USC's pharmacy license had lapsed."  (Gov't Mot. 7.)  The Government states that "[a]s an executive at his family company, [Glover] participated in leadership meetings with USC's pharmacists, where these types of topics"—the state regulatory issues—"were raised and discussed."  (*Id*. 13.)

The Government proffers that "several of the state disciplinary actions related to the unlawful distribution of prescription drugs without valid prescriptions."  (Gov't Mot. 13.)

However, as the Defense points out, there is no allegation that any of the state board proceedings involved Glover himself, the Veterinarian, or the Drug.  (*See* Def. Mot. 30–31.)  The conduct at issue in the Colorado and Minnesota proceedings related to shipment of other medications as "office stock to a practitioner, rather than pursuant to a patient-specific prescription," and the conduct at issue in the Maryland proceeding related to relatively short "lapse[s]" of USC's "distributor" and "non-resident pharmacy permit[s]."  (*Id.* 31.)  The Government does not appear to dispute the Defense's characterizations of these proceedings.  (*See generally* Gov't Opp'n (no discussion of Colorado, Minnesota, or Maryland state pharmacy board proceedings).)  The Government also does not respond to the Defense's contention that there is no allegation that Glover "received or reviewed the[] disciplinary proceedings."  (Def. Mem. 30.)

The state pharmacy board infractions are too attenuated from the charged conspiracy to be "direct proof" of it, so this evidence must be analyzed as "other crimes" evidence under Rule 404(b).  *Kaiser*, 609 F.3d at 570; *cf. Zhong*, 26 F.4th at 552 ("If necessary, the government may introduce evidence of uncharged criminal conduct to complete the story of the crime on trial, not to tell a new one." (internal quotation marks omitted)).  However, the Government has not explained the extent of Glover's personal knowledge of the state regulatory proceedings, which is pertinent to the purpose of this category of evidence and whether its probative value is substantially outweighed by any prejudicial effect.  I will hold a ruling on these motions in abeyance pending further discussion at the pretrial conference, during which the parties should be prepared to address the extent of Glover's personal knowledge of the state board of pharmacy violations.

## 2. 2015 FDA Investigation

USC's sterile pharmacy facility (known as the "503B Facility") shared a building with its non-sterile pharmacy facility (the "503A Facility"). USC compounded and shipped the Drug that was the subject of the purported conspiracy in the non-sterile facility. (*See* Gov't Mot. 7.) In 2015, following a recall of certain USC drugs, FDA investigators inspected the 503B Facility and met with various USC executives, including Glover. (*Id*.) The FDA "identified multiple compliance failures creating contamination risks" within the 503B Facility. (*Id*.) As a result, USC closed the 503B Facility for nearly a year and recalled or destroyed millions of dollars' worth of sterile drugs. (*Id*.) The closure of the 503B Facility "forc[ed] USC to terminate numerous employees and default on vendor payments." (*Id*.)

The FDA's investigation is not related enough to the charged conspiracy to constitute "direct proof" of it. *Kaiser*, 609 F.3d at 570. The Drug that was the subject of the conspiracy was not manufactured in the 503B Facility, and the Government does not proffer that Glover would have discussed regulations pertinent to the subject Drug during the meetings with the FDA regarding its inspection of the 503B Facility. Nor is this information "necessary to complete the story of the crime on trial." *United States v. Robinson*, 702 F.3d 22, 37 (2d Cir. 2012) (internal quotation marks omitted).

However, evidence of the pressures—both financial and operational—that the FDA inspection placed on USC is relevant to Glover's motive to engage in the charged conspiracy. *See* Fed. R. Evid. 404(b)(2). Glover, as a sales executive, had an incentive to help USC's bottom line given the revenue losses following the FDA inspection and ensuing recall. The Glover family's ownership of USC—which Defendant refers to as "his father's company," (Def. Mot. 1), and the fact that Glover's sister also worked at USC, (Gov't Mot. 3)—would have provided an

additional personal stake for Glover in ensuring USC's financial well-being in the aftermath of the FDA investigation. The financial impact of the investigation therefore properly establishes Glover's "motive" under Rule 404(b)(2).

Defendant argues that evidence of the target of the investigation—"contamination risks" in USC's sterile pharmacy facility—would be unfairly prejudicial. (Def. Opp'n 4.) However, based upon the description of this evidence and the purpose for which it is being offered, it is unnecessary for the Government to discuss the details of the subject of the investigation in order to explain its operational and financial impact on USC. Accordingly, the Government's motion is GRANTED concerning the financial impact of the 2015 FDA investigation and relevant background. The Government's motion is DENIED and the Defense's motion is GRANTED with regard to the details of the investigation. Ahead of the final pretrial conference, the parties should meet and confer regarding proposed limiting principles and curative instructions for this testimony.

### 3. Disagreements with USC Pharmacists Regarding Ponazuril and a Pain Medication

In two instances, Glover disagreed with USC pharmacists regarding the propriety of shipping particular orders. Specifically, in 2019, Glover agreed to sell Ponazuril, a USC-compounded drug, to a farm (the "Farm") that raised food-producing hogs. (Gov't Mot. 8.) Even though USC pharmacists warned Glover that "it was illegal to distribute the drug knowing it would be used on food-producing animals," Glover "insisted on fulfilling the order, and repeatedly misrepresented to the pharmacists that the medications would be used on horses or non-food-producing hogs." (*Id*.) Over USC pharmacists' objections, Glover directed USC's shipping department to send the Ponazuril to the Farm. (*Id*.) After learning the Ponazuril

shipment was dispatched, a USC pharmacist called the shipping company responsible for the order to recall it.  (*Id*.)

Additionally, "[b]etween in or about 2019 and 2020," USC pharmacists learned that Glover sought to ship a human pain medication (the "Pain Medication") overseas.  (*Id*.)  One pharmacist told Glover "that USC lacked a permit to sell the Pain Medication overseas, . . . [that USC] could not verify prescriptions for this international shipment, . . . that shipping the pain Medication overseas was not legal[,] and that other USC pharmacists did not agree with the practice and would not put their names on any such shipments."  (*Id*.)  During a visit to the USC compounding facility, Glover "demand[ed]" that USC ship the Pain Medication overseas "that day[,] . . . stating that he would pack the order himself if necessary."  (*Id*.)  Despite the pharmacists' admonishments, when they returned to work the next day, they were told that Glover had brought the Pain Medication to the USC shipping department himself and that it had been dispatched.  (*Id*. 9.)  The Government contends that "[t]he USC pharmacists" involved in warning Glover about the Ponazuril and the Pain Medication "are the very same individuals who told [Glover] that the charged scheme involving the Veterinarian was illegal."  (*Id*. 14.)

This evidence is admissible under Rule 404(b) to establish Glover's knowledge, lack of mistake, and "modus operandi."  *United States v. Walker*, 789 F. App'x 241, 244 (2d Cir. 2019) (summary order) (affirming admission of testimony as modus operandi evidence).  Glover concedes that his "state of mind and good faith" will be in issue at trial, because good faith "is a complete defense to the charged crime."  (Def. Opp'n 9.)  For the disputes with the USC pharmacists to be probative of Glover's state of mind, there must be "a similarity or connection" between the prior disputes and the charged offense.  *United States v. Paulino*, 445 F.3d 211, 223 (2d Cir. 2006) (internal quotation marks omitted).  The incidents with the Ponazuril and the

overseas shipment of the Pain Medication are similar to the charged offense in that both involved Glover causing a USC-compounded medication to be shipped with an invalid or nonexistent prescription over the objection of USC pharmacists.  This information, and Glover's purported misrepresentations to the pharmacists, tend to "rebut" any defense Glover may raise that his actions with regard to the charged conspiracy were "innocent," *United States v. Edwards*, 342 F.3d 168, 177 (2d Cir. 2003), or taken in "good faith," (Def. Opp'n 9).  It would also blunt any argument that Glover's acts in furtherance of the charged conspiracy were made by mistake.  *See Edwards*, 342 F.3d at 177 (noting that prior bad acts evidence is admissible as "proof of . . . absence of mistake" (quoting Fed. R. Evid. 404(b)).  The probative value of this evidence is not substantially outweighed by any prejudicial effect given that Glover appears to intend to make his good faith a live issue for the jury, and this category of prior uncharged conduct is not "more inflammatory than the charged crime."  *Paulino*, 445 F.3d at 223 (internal quotation marks omitted).

Accordingly, the Government's motion *in limine* is GRANTED as to this evidence, and Defendant's motion is DENIED.

### 4.  USC Sales to California Customer

In June 2020, a new USC sales representative emailed a California-based customer of USC offering to sell USC-compounded drugs to the customer if it could receive the drugs at an address outside of California.  (Gov't Mot. 9.)  Surprised, the customer forwarded the email to a USC sales director, expressing concern that the new sales representative was "willing to basically illegally sell drugs to us if we were able to receive them in another state and then bring them across the border."  (*Id*.)  The sales director then forwarded the email to others at USC, stating that he had notified Glover of the new representative's message and expressing concern

that the email endorsed unethical and illegal conduct.  (*Id.*)  A USC human resources employee responded, copying Glover and "assuring the Sales Director that the reported concerns had been addressed and appropriate disciplinary actions taken."  (*Id.*)

Unlike with the Ponazuril and the Pain Medication, the Government's proffer here is limited to Glover's possible knowledge of the actions of a different person, namely, the new sales representative.  The Government does not assert that Glover took any action in connection with the new sales representative's offer to the California customer of USC.  As with the state board-of-pharmacy violations, *see supra* § III.A.1., I will hold a ruling on the parties' motions in abeyance pending further discussion at the pretrial conference.  The parties should be prepared to discuss Glover's involvement with this incident, if any, during the conference.

### 5.  Agreements with Other Veterinarians

"[A]t the end of 2013 or early 2014," Glover and a co-conspirator at USC "had a 'handshake' deal with two other licensed veterinarians . . . to sign off on prescription veterinary medications without having an established vet-client-patient relationship ('VCPR')."  (Def. Mem. 32.)  The deal included Glover's agreement "to pay" the two veterinarians, (*id*. 33), to whom I will refer to as "Veterianarian-1" and "Veterinarian-2."  The Government explains that "the kickback scheme began with Veterinarian-1, eventually include[ed] Veterinarian-2, and, ultimately, the Veterinarian" that is the subject of the charged conspiracy.  (Gov't Opp'n 24.)  Eventually, Veterinarian-2 ended his participation in the agreement, "citing a state law restricting payments from pharmaceutical companies to veterinarians."  (*Id.*)  Defendant argues, over the Government's opposition, that this evidence should be excluded during trial.  (*See* Def. Mem. 32–34; Gov't Opp'n 24–28.)[5]

---

[5] The Government's motion *in limine* did not discuss this evidence.

I agree with the Government that evidence of the prior agreements with Veterinarians -1 and -2 is admissible both as direct evidence of the charged offense and under Rule 404(b).  The "handshake" arrangement involving Glover, his co-conspirator, Veterinarian-1, and Veterinarian-2 involves substantially the same conduct as the charged conspiracy, thus providing "background" to both the charged conspiracy and the "mutual trust that existed between" Glover and one of his "coconspirators." *United States v. Rosemond*, 958 F.3d 111, 125 (2d Cir. 2020) (quoting *United States v. Dupree*, 870 F.3d 62, 76 (2d Cir. 2017)).  The fact that Veterinarian-2 withdrew from the deal also helps explain how and why Glover and his co-conspirators "developed" the "illegal relationship" with the Veterinarian.  *Id*.  Additionally, given that these deals predated Adamis's acquisition of USC, comparing the pre-acquisition deals with Veterinarians -1 and -2 to the post-acquisition arrangement with the Veterinarian is relevant to explaining why and how Glover purportedly "conceal[ed]" the payments to the Veterinarian from Adamis.  (Indictment ¶ 4.)  For these reasons, evidence of the deal with Veterinarian-1 and Veterinarian-2 "is necessary to complete the story of the crime on trial" and is admissible as direct evidence of the charged conspiracy.  *Zhong*, 26 F.4th at 551 (internal quotation marks omitted).  Additionally, although the handshake deal was not noticed as Rule 404(b) evidence, it would be admissible under that rule to show Glover's modus operandi and motive in committing the charged offenses.  *See Walker*, 789 F. App'x at 244.  Finally, this category of evidence clears the Rule 403 balancing test because the preceding "conduct is not any more sensational or disturbing than the charged crime." *Rosemond*, 958 F.3d at 125 (internal quotation marks omitted).  While the defense points out that the handshake deal "did not include . . . a written consulting agreement" and did not involve another co-conspirator of the charged crime, (Def. Mot. 33), these distinctions bolster the conclusion that handshake deal was a precursor of what

was to come.  In any event, "[e]vidence of other acts need not be identical to the charged conduct" to be admissible, rather, "there must be *substantial* relevancy." *United States v. Cadet*, 664 F.3d 27, 32–33 (2d Cir. 2011) (internal quotation marks omitted).

The Defense argues that the fact that these agreements predated the 2015 FDA inspection and resulting financial pressure undermines the Government's argument, *see supra* § III.A.2., that these pressures were motive for Glover's involvement in the charged conspiracy.  (Def. Mot. 33–34.)  I find that this argument goes to the weight of this evidence, not its admissibility.

The Defense also argues that admitting this evidence "would result in a mini-trial that would cause jury confusion and undue delay," citing *United States v. Jadusingh*, No. 18-CR-257, 2020 WL 207950, *4 (E.D.N.Y. Jan. 14, 2020) in support.  (Def. Mot. 34.)  There, the defendant was alleged to have picked up her co-defendant from JFK airport knowing the co-defendant possessed drugs.  *Jadusingh*, 2020 WL 207950, at *4.  The Court denied the Government's motion *in limine* to introduce evidence that nineteen years prior to the charged offense, the defendant—under duress of violence and threats—agreed to ingest drugs to smuggle them into the United Kingdom.  *Id*.  The Court reasoned that the conduct and circumstances of the prior drug smuggling "differ[ed] starkly" from the charged offense and would therefore confuse the jury.  *Id*.  The facts in *Jadusingh* are clearly distinguishable from the facts here.  The handshake deal with Veterinarian-1 and Veterinarian-2 flowed directly in time into the written agreement with the Veterinarian, and both agreements involved the same conduct on the part of Glover— paying a veterinarian to write fake prescriptions.  Therefore, rather than this evidence being a "mini-trial," (Def. Mot. 34), it is directly relevant to the charged conspiracy and helps explain how the conspiracy developed.

Accordingly, Defendant's motion *in limine* is DENIED as to this category of evidence.

## B. *Prior Lawful Activity*

The Government moves to preclude Glover "from introducing evidence that the Drug, or any other USC product, was lawfully dispensed with valid prescriptions on particular occasion." (Gov't Mot. 17.)  In opposing the motion, Defendant indicates that he intends to introduce: (1) evidence of "[i]nstances in which the Veterinarian had a proper [VCPR] and the Drug was lawfully dispensed pursuant to a valid prescription"; (2) evidence of Glover's "duties, responsibilities, work and observations at [USC] . . . including his knowledge of lawful prescriptions"; and (3) evidence that will show Glover "was aware that []USC retained lawyers, finance professionals and other subject matter specialists in connection with its business."  (Def. Opp'n 8–9, 10 n.2.)  Glover states that he intends to introduce this evidence "not as evidence of good character but rather as evidence of his state of mind and good faith beliefs, negating an intent to defraud."  (*Id*. 9.)

Evidence of a defendant's participation "in other, non-fraudulent activity is generally irrelevant," except where "'a defendant is alleged to have always or continually committed bad acts or where the evidence of good acts would undermine the underlying theory of a criminal prosecution.'"  *United States v. Balboa*, No. 12-CR-196, 2013 WL 6196606, at *3 (S.D.N.Y. Nov. 27, 2013) (quoting *United States v. Damti,* 109 F. App'x 454, 455–56 (2d Cir. 2004) (summary order)) (cleaned up); *accord United States v. Scarpa*, 913 F.2d 993, 1011 (2d Cir. 1990) ("A defendant may not seek to establish his innocence . . . through proof of the absence of criminal acts on specific occasions.").

The parties proffer conflicting interpretations of the Indictment.  The Government states that "the indictment does not allege 'ceaseless criminal conduct.'"  (Gov't Mot. 18 (quoting *Scarpa*, 913 F.2d at 1010).)  Defendant, on the other hand, characterizes the Indictment as

alleging "a wide-ranging, continuing course of fraudulent conduct permeating [USC]'s sales of the Drug," or "pervasive and continuous fraudulent activity." (Def. Opp'n 8.) I agree with the Government's interpretation—the Indictment certainly alleges that Glover engaged in a wide-ranging conspiracy "[i]n his role at both USC and [its post-merger successor company,] Adamis," but it does not suggest that Glover's only conduct in that role was related to the conspiracy. (Indictment ¶ 3.) Nor does it allege that USC only distributed the Drug through the charge conspiracy.

Thus, the Government's motion is GRANTED to the extent that Glover may not introduce evidence regarding "other, non-fraudulent activity" outside the scope of the charged conspiracy; such information is "irrelevant" to Defendant's guilt or innocence of the charged conspiracy. *Balboa*, 2013 WL 6196606, at *3 (internal quotation marks omitted). He may, however, introduce evidence of his mental state as to the prescriptions alleged to be part of the charged conspiracy in order to negate the mental-state element of the offenses for which he is charged. The parties should meet and confer concerning whether a curative instruction should be given with regard to this evidence, and, if so, propose language for such an instruction.

### C. *Selective Prosecution*

The Government moves to "preclude evidence and argument concerning the Government's motives [for prosecuting Glover], any claim that the defendant is being selectively prosecuted, and any suggestion that the defendant's conduct should be dealt with solely as a regulatory matter." (Gov't Mot. 20.) Defendant disclaims any intent to introduce such evidence or argument at trial. (*See* Def. Opp'n 5.) The Government's motion is therefore DENIED as moot.

### D. *Glover's Personal Circumstances and Potential Punishment*

The Government seeks to preclude "evidence and argument" regarding Glover's "family background, health, age, [] any similar factors," or "the punishment or consequences he faces if convicted," including in Glover's opening statement. (Gov't Mot. 22–23.)

"District courts generally have 'wide discretion concerning the admissibility of background evidence,' including evidence of a defendant's personal characteristics." *United States v. Konstantinovskiy*, No. 19-CR-408, 2024 WL 3360379, at *11 (E.D.N.Y. July 10, 2024) (quoting *United States v. Blackwell*, 853 F.2d 86, 88 (2d Cir. 1988)). Although "[b]asic background information, such as education and employment, are routinely admitted, a defendant's personal characteristics and circumstances are . . . usually irrelevant to the issue of guilt or innocence under FRE 401, or any relevance of such evidence is outweighed by the risk of prejudice under FRE 403, and such evidence is therefore generally excluded." *Id.* (citations omitted).

In this case, as the Defense points out, (*see* Def. Opp'n 6), Glover's family circumstances are relevant insofar as USC was his father's company and because his sister also worked at the company. As discussed *supra* § III.A.2., Glover's family ties to USC may be relevant to his motives, and more details about his background as to these relationships may be relevant depending on the evidence and argument introduced at trial. Other matters related to Glover's "circumstances" and "personal characteristics," however, are not relevant to his guilt or innocence. *Konstantinovskiy*, 2024 WL 3360379, at *11. The Government's motion is therefore DENIED as to Glover's family circumstances in relation to his family's ownership of USC and his sister's employment by USC, and is GRANTED as to other of Glover's circumstances and characteristics. The parties are directed to provide notice to me of the substance of the evidence

related to this ruling in advance of presenting it to the jury, so that I may rule on specific evidence.

Additionally, the Defense states that it "expects" that the Government, "through the cooperating witnesses and their plea agreements," will be the party to "introduce the concept of punishment." (Def. Opp'n 6.) It is well-established that a defendant cannot make argument or offer evidence concerning the consequences he would face if convicted. *See Shannon v. United States*, 512 U.S. 573, 579 (1994) ("[P]roviding jurors sentencing information invites them to ponder matters that are not within their province, distracts them from their factfinding responsibilities, and creates a strong possibility of confusion."). Permitting such a sympathy pitch "creates a substantial danger that the jury will consciously or subconsciously allow knowledge of such punishment to impact on their deliberations on the question of the defendant's guilt or innocence," *United States v. Graziano*, 558 F. Supp. 2d 304, 327 (E.D.N.Y. 2008), and thus reach a verdict contrary to the law. The Government's motion *in limine* is GRANTED to preclude introduction of such evidence during trial.

### E. *Co-Conspirator Statements*

The Government next seeks a ruling that statements[6] from "two cooperating witnesses ('CW-1' and 'CW-2')" are admissible under Rule 801(d)(2)(E) as co-conspirator statements in furtherance of a conspiracy. (Gov't Mot. 23.) Specifically, the Government states that:

> CW-1 and CW-2 are expected to testify that, following Adamis's acquisition of USC, the kickback payments to the Veterinarian were concealed by entering into a consulting agreement with the Veterinarian, which provided 'cover' for the payments to the Veterinarian . . . instead of the true reason for the payments, namely, the commission payments for sales of the Drug. . . .
>
> CW-1 is expected to testify that he worked with others, including the Vice President

---

[6] The scope of the Government's motion is limited to statements where Glover "himself was not a participant in the communications." (*Id.* 24 n.3.)

of Finance, to calculate the amount of kickbacks owed to the Veterinarian and to help facilitate payment to the Veterinarian. . . . At times, such communications included a historical accounting of how much USC had paid the Veterinarian.

(*Id*. 23–24, 26.)

To admit an out-of-court statement offered for its truth under Rule 801(d)(2)(E), a "district court must find by a preponderance of the evidence (a) that there was a conspiracy, (b) that its members included the declarant and the party against whom the statement is offered, and (c) that the statement was made during the course of and in furtherance of the conspiracy." *United States v. Farhane*, 634 F.3d 127, 161 (2d Cir. 2011) (internal quotation marks omitted). The party offering the statement must show that there is "a common agreement to achieve a particular objective in furtherance of which the out-of-court statement is made," but "the objective of the joint venture need not be any particular crime charged in the indictment." *United States v. Coppola*, 671 F.3d 220, 246 (2d Cir. 2012) (internal quotation marks omitted). "[T]here must be some independent corroborating evidence of the defendant's participation in the conspiracy" aside from the co-conspirator statement itself. *United States v. Gigante*, 166 F.3d 75, 82 (2d Cir. 1999) (quoting *United States v. Tellier,* 83 F.3d 578, 580 (2d Cir. 1996)). Such corroborating evidence can include "[t]he identities of both the declarant and the witness who heard the hearsay evidence," *id*., as well as other "circumstances surrounding the statement," *United States v. Gupta*, 747 F.3d 111, 123 (2d Cir. 2014). "Statements between conspirators which provide reassurance, serve to maintain trust and cohesiveness among them, or inform each other of the current status of the conspiracy, further the ends of [a] conspiracy." *Gupta*, 747 F.3d at 123 (quoting *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir. 1991)).

I agree with Defendant that the Government's motion is not ripe for a ruling at this time. (*See* Def. Opp'n 10.) The bases on which to admit testimony under Rule 801(d)(2)(E) "cannot

be applied in the abstract"; rather, "[a]dmissibility ultimately must turn on characteristics of the particular items of evidence." *United States v. Bankman-Fried*, No. 22-CR-673, 2023 WL 6283509, at *3 (S.D.N.Y. Sept. 26, 2023).  The Government's summaries of the testimony they expect to elicit do not include the "circumstances surrounding the statement[s]" that I must consider in deciding whether to admit the statements under the Rule.  *Gupta*, 747 F.3d at 123.

The Government's motion is therefore DENIED without prejudice to offering this evidence at trial after offering some evidence of the existence of the conspiracy.  *See Bankman-Fried*, 2023 WL 6283509, at *3; *United States v. Ilori*, No. 21-CR-746, 2022 WL 2452258, at *3 (S.D.N.Y. July 5, 2022) ("These statements may well be admissible as statements of co-conspirators.  But Defendant is free to object that any particular statement does not meet the tests [for admission under Rule 801], and the Court cannot rule until it has the information necessary to do so.").

### F.  *Drug Purchase Orders*

Next, the Government seeks a ruling *in limine* to admit emails from USC sales representatives to USC pharmacists containing orders for the Drug with instructions to process the order as a prescription from the Veterinarian.  (Gov't Mot. 27–30; *see also id*., Ex. A.)[7]  The Government states that these orders are admissible:  (1) as "non-hearsay because they communicate a directive or an action" rather than being offered for truth; (2) as business records under Rule 803(6); and/or (3) as "statements made by the defendant's agent or employee on a matter within the scope of that relationship" under Rule 801(d)(2)(D).  (*Id*. 27–30.)  Glover argues that admission of this evidence is premature, but does not raise a substantive objection to the Government's bases for admission.  (*See* Def. Opp'n 10–11.)

---

[7] "Ex. A" or "Exhibit A" refers to Exhibit A to the Government's motion, submitted under seal on May 14, 2025.

With regard to the Government's Exhibit A, I agree that this email "was an order, *i.e.*, an imperative rather than a declarative statement." *United States v. Dawkins*, 999 F.3d 767, 789 (2d Cir. 2021); *see also United States v. Bellomo*, 176 F.3d 580, 586 (2d Cir. 1999) ("Statements offered as evidence of commands or threats or rules directed to the witness, rather than for the truth of the matter asserted therein, are not hearsay.").  The email contains instructions by one of Glover's alleged co-conspirators to the USC pharmacy to fill an order for a certain quantity of the Drug, prescribed by the Veterinarian, to a particular customer.  (*See* Gov't Mot., Ex. A.)  This email is relevant to the nature of the charged conspiracy and, if offered for "the fact that it was said, . . . [is] not hearsay."  *Dawkins*, 999 F.3d at 789.

The Government's motion is therefore GRANTED as to Exhibit A as a non-hearsay imperative statement.  I decline to rule at this time on the other proffered grounds for the admission of Exhibit A, and on any grounds for the drug purchase orders not before me.  *See Bankman-Fried*, 2023 WL 6283509, at *3 (denying as premature motion based on, *inter alia*, Rules 801(c), 801(d)(2)(D), and 803(6) to admit "general categories of out-of-court statements as well as excerpted out-of-court statements of which the Court ha[d] been provided only with portions").  The Government may seek admission of this evidence on the other grounds during trial, subject to laying a proper foundation.

### G.  *Use of the Words "Illegal," "Scheme," "Sham," or "Kickback"*

Glover seeks an *in limine* ruling precluding the Government—except for during its opening statement and summation—from using the words "illegal," "scheme," "sham," or "kickback" to describe Glover's conduct or the arrangement with the Veterinarian.  (Def. Mot. 7–8 (use of "illegal," "scheme," or "sham"); Def. Opp'n 11–12 (use of "kickback").)  The Defense argues that the use of these words is "prejudicial" and "would amount to assuming facts not in

evidence," asserting that "the issues of whether the arrangement with the Veterinarian was in fact a 'sham' and whether [Glover] knew it are the central jury issues in this case, as is the legality of certain prescription shipments." (Def. Mot. 7–8.) Glover proposes that I prohibit the Government and the trial witnesses from using these terms, and that I require the use of "neutral term[s]" such as "consulting agreement" or "arrangement" to describe the conduct at issue in the case. (*Id.* 8.)

## 1. References to "Illegal" Conduct

In opposing Glover's request to preclude references to "illegal" conduct, the Government points out that the Indictment charges Defendant with violating 21 U.S.C. § 333(a)(2), which makes it a "felony" to conspire to deliver misbranded drugs "'with the intent to defraud or mislead.'" *United States v. Navarro*, 551 F. Supp. 3d 380, 389 (S.D.N.Y. 2021) (quoting 21 U.S.C. § 333(a)(2)).[8] (*See* Gov't Opp'n 5.) Whether Glover had the intent to defraud or mislead is therefore a question for the jury to resolve during trial. *See McCormick v. United States*, 500 U.S. 257, 270 (1991) ("It goes without saying that matters of intent are for the jury to consider."). The Government expects it will elicit testimony that on different instances USC pharmacists told Glover that it was "illegal" to fill the Veterinarian's prescriptions without a valid VCPR and to pay the Veterinarian consulting fees in exchange for prescriptions. (Gov't Opp'n 3–4.) After a

---

[8] The Government contends that "state regulators" such as the state boards of pharmacy discussed *supra* § III.A.1. are within the scope of entities that the statute makes it a felony to intentionally defraud or mislead. (Gov't Opp'n 5.) There is broad agreement that "at a minimum, intent to defraud either the FDA or users of adulterated drugs, or both, makes the violation a felony." *Navarro*, 551 F. Supp. 3d at 391 (citing, *inter alia*, *United States v. Dessart*, 823 F.3d 395, 403 (7th Cir. 2016); *United States v. Milstein*, 401 F.3d 53, 69–70 (2d Cir. 2005)). In *United States v. Navarro*, Judge Mary Kay Vyskocil concluded that state "racing officials and regulators properly are considered potential objects of fraud for the purpose of the felony enhancement provision of the drug adulteration statute." 551 F. Supp. 3d at 397; *see id*. 397–405. Defendant briefly states that state regulations and veterinary requirements "complicate[]" the "legal framework," (Def. Mot. 7), but does not opine on the scope of the statute's prohibition on intent to defraud and mislead. An appeal involving this issue is currently pending before the Second Circuit. *See United States v. Fishman*, No. 22-1600 (2d Cir. docketed July 22, 2022). I need not and do not opine on this issue to resolve the pending motions.

contentious meeting in the fall of 2020, multiple pharmacists resigned after Glover gave them an ultimatum to continue filling the Veterinarian's orders of the Drug over their objections. (*Id.*)

This evidence is relevant to Glover's intent, *i.e.*, whether he knew or had reason to know that the Veterinarian's prescriptions of the Drug and/or the consulting agreement with the Veterinarian violated the law. *Cf. United States v. Skelos*, 988 F.3d 645, 663 (2d Cir. 2021) (affirming decision to admit evidence of a "nasty" and "rude[]" phone call because the evidence "tended to prove [the defendant's] awareness that his conduct was unlawful," and therefore its "considerable probative value regarding [the defendant's] intent" outweighed any unfair prejudice). To the extent that the jury may confuse references to "illegal" conduct as testimony that Glover's conduct at issue in this case violated 21 U.S.C. §§ 331 and 333, the parties should propose a limiting instruction to avoid any unfair prejudice under Rule 403. *Cf. Bankman-Fried*, 2023 WL 6283509, at *2 ("Any risk [of unfair prejudice] . . . may be foreclosed by an appropriate instruction, which the Court would entertain if requested.").

Glover's motion to preclude references to "illegal" conduct is DENIED.

### 2. References to "Scheme," "Sham," or "Kickbacks"

Glover argues that references to the terms "scheme," "sham," or "kickbacks" would be unfairly prejudicial under Rule 403, would assume facts not in evidence, and would "encroach on the court's province to explain terms of legal significance to the jury." (Def. Mot. 8.) Black's Law Dictionary defines "scheme" as an "artful plot or plan, usu[ally] to deceive others"; defines "sham" as a "false pretense or fraudulent show"; and defines "kickback" as a "return of a portion of a monetary sum received, usu[ally] as a result of coercion or a secret agreement." *Scheme, Scam, Kickback*, Black's Law Dictionary (12th ed. 2024).

I agree with the Government that there is no basis to instruct witnesses to avoid these words in their testimony. The Government states that "use of language like 'sham' is permissible because it conveys the witness's understanding that the arrangement was not a legitimate consulting arrangement." (Gov't Opp'n 10.) To the extent that the testimony elicited at trial reflects that understanding, use of the words "scheme," "scam," or "kickback" would be consistent with the way that Black's Law Dictionary defines these words. *Cf. United States v. Priolo*, No. 21-CR-566, 2025 WL 679413, at *40–41 (E.D.N.Y. Mar. 4, 2025) (explaining that referring to certain exhibits as "prize notice[s]" when the language of the exhibit was "synonymous" with that term did not assume facts not in evidence or cause unfair prejudice). Although Glover argues that use of these words would invite unfair prejudice, I agree with the Government that instructing witnesses to avoid certain words in their testimony also risks confusing the witnesses and jurors, potentially "lead[ing] to a misunderstanding that the Government is somehow directing the witnesses' testimony." (Gov't Opp'n 11.) I also note that certain witnesses will be describing their own perceptions and their own conduct, which may include conduct to which they have pled guilty. Therefore, they should be entitled to describe in their own words what they believe they did or what they understand to have occurred. *See, e.g.*, Wigmore on Evidence § 725 (4th ed. 1985, 2025-2 cum. supp.) (explaining that a witness's "recollection should . . . correspond to and represent the impressions originally gained by observation" (emphasis omitted)).

Glover's motion to preclude the use of these words is DENIED.

### H.  *USC's 2024 Bankruptcy*

Glover's motion to preclude the Government from offering evidence regarding USC's 2024 bankruptcy is DENIED as moot, since the Government does not intend to introduce such evidence at trial.  (*See* Gov't Opp'n 1 n.1.)

### I.  *USC's Promotional and Marketing Compliance Policies*

Glover next seeks a ruling precluding the Government from introducing a USC-produced document titled Promotional and Marketing Compliance Policies for Veterinary Services (the "Policies").  (Def. Mot. 11–14; *Id*., Ex. 2.)[9]  The "Introduction" section of this document includes a section excerpting various state laws "relating to the sale and marketing of prescription drug products," and the document makes general reference throughout that some federal laws are relevant to USC's business.  (Ex. 2 at 2, *id*. 2–10.)  The document also states that it is a USC policy that "[n]o grant may be made for the purpose of influencing any veterinarian's purchasing, prescribing, or treatment decisions in favor of USC products."  (*Id*. 12.)  The Defense argues that the document should be precluded because the federal and state laws it references "have no bearing on [Glover's] alleged violation of federal misbranding and adulteration statutes."  (Def. Mot. 12.)  Further, Glover asserts that if the Policies "were introduced into evidence, the jury might falsely assume that [USC]'s alleged payments to the Veterinarian based on the volume of medications he prescribed violates federal anti-kickback laws."  (*Id*. 13–14.)  I disagree.

As discussed *supra* § III.A.3. and III.G., Glover's state of mind as to whether his conduct was illegal will be at issue during trial.  Glover's knowledge of USC's Policies is relevant to

---

[9] "Ex. 2" or "Exhibit 2" refers to Exhibit 2 to Defendant's motion filed under seal on May 14, 2025.  Pincites refer to the internal pagination of the document.

whether he knew that his purported arrangement with the Veterinarian—including the Veterinarian's alleged prescriptions of the Drug to horses he had not seen—was wrong. The Government does not intend to argue that Glover violated either the state laws or the USC policies that are outlined in the Policies document. (*See* Gov't Opp'n 12.) As with the use of the word "illegal," *see supra* § III.G., the risk of any unfair prejudice may be mitigated by a curative jury instruction. The parties are directed to propose language for a curative instruction in advance of this evidence being offered.

Glover's motion is therefore DENIED.

### J. *Expert Witness*

During trial, the Government intends to call Dr. Stephanie Mongeluzzi ("Dr. Mongeluzzi" or the "Expert") as an expert witness. (*See* Def. Mem., Exs. 8–10 (expert witness notification and disclosures).) [10] Dr. Mongeluzzi graduated from Cornell University in 2013 with a B.S., *magna cum laude*, in Animal Science and Biological Sciences, received a Doctor of Veterinary Medicine from Cornell in 2017, and received a M.S. in Veterinary Epidemiology from the Royal Veterinary College in London in 2021. (Ex. 9 ("CV").) Between January 2010 and July 2020, Dr. Mongeluzzi held various positions as a veterinarian in clinical practice. (*Id.*) From October 2021 to May 2022, she was a fellow in the FDA Center for Veterinary Medicine, Office of Research. (*Id.*) Since September 2022, Dr. Mongeluzzi has served as a Veterinary Medical Officer at the FDA Center for Veterinary Medicine, Office of Surveillance and Compliance. Her work at the FDA "involves numerous aspects of unapproved new animal drug matters, . . . reviewing compounded veterinary drugs distributed in the United States to determine

---

[10] "Exs. 8–10" or "Exhibits 8–10" refer to Exhibits 8, 9, 10 to Defendant's motion submitted under seal on May 14, 2025.

whether the drug's distribution is consistent with the FDA[]'s published guidance and enforcement priorities," and "inspecting compounding pharmacies, which includes reviewing [their] prescription records."  (Ex. 10 ("Expert Disclosure") at 1–3.)

Dr. Mongeluzzi is expected to testify—based on her education, experience, and review of the relevant laws and regulations—that "one of the ways in which a drug can be misbranded is if it is a prescription drug that is not accompanied by a lawful prescription."  (*Id*. 1.)  She is also expected "to opine that a veterinarian who is not acquainted with an animal cannot issue a lawful prescription," and that "[p]ursuant to a *bona fide* VCPR relationship, a veterinarian is expected to be acquainted with the animal and establish its current health conditions."  (*Id*. 2.)  According to the Expert, "[b]efore issuing a prescription, typically a veterinarian needs to establish a diagnosis following an examination of the animal, discuss the diagnosis with the owner, conduct any necessary tests, create a treatment plan and be available for after-care."  (*Id*.)  Additionally, the Expert is expected to "opine that the practice at USC of listing [the Veterinarian]'s name when submitting orders to USC pharmacists for the Drug does not alone reflect the issuance of a lawful prescription."  (*Id*.)

As relevant here,[11] Glover objects to the Expert's testimony because:  (1) the notice does not explain how "Dr. Mongeluzzi's role at the FDA . . . contribut[es] to the basis for her opinions"; and (2) "her proposed 'expert' testimony simply regurgitates the regulations selected by the [G]overnment to fit its theory of the case."  (Def. Mot. 36–37.)

---

[11] The Expert's Disclosure also included her anticipated testimony about the reasons why the Drug, which is "omeprazole/fenbendazole paste," is classified as a prescription drug under FDA regulations, and that certain prescriptions of the Drug lacked adequate labeling.  (Expert Disclosure 1.)  These topics are the bases for the first, third, and fourth of Glover's five objections to the Expert's testimony.  (*See* Def. Mot. 36–37.)  Based on the Defense's representations that "it does not plan to contest that the Drug requires a prescription when distributed to individual animal patients," the Government states that it does not intend to elicit this testimony from the Expert, rendering this category of Glover's objections moot.

These objections are without merit.  Expert testimony is generally admissible if the witness is "qualified as an expert by knowledge, skill, experience, training, or education" and the opinion "will help the trier of fact to understand the evidence," is "based on sufficient facts or data," is "the product of reliable principles and methods," and "reflects a reliable application of [those] principles and methods to the facts of the case."  Fed. R. Evid. 702; *accord Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 588–95 (1993) (discussing Rule 702).  Dr. Mongeluzzi's education and experience qualify her as an expert—she has served both as a veterinarian in a clinical setting, which helps contextualize any evidence regarding the Veterinarian's conduct, and now serves as a veterinarian in the veterinary compliance division of the FDA, the agency responsible for administering federal law and regulations applicable to veterinarians.  Indeed, the FDA is an entity which 21 U.S.C. § 333(a)(2) makes it a felony to defraud or mislead.  *Navarro*, 551 F. Supp. 3d at 391.  That Dr. Mongeluzzi's role at the FDA involves investigating drug compounding facilities informs her perspectives on the compounding practices of USC.  Glover's objection regarding the Expert's role at the FDA fails.

As to Glover's second objection, it is true that an expert may not testify as to "legal conclusions," that is, that certain conduct violated the law.  *Tang Cap. Partners, LP v. BRC Inc.*, 757 F. Supp. 3d 363, 391 (S.D.N.Y. 2024) (internal quotation marks omitted); *accord id*. (collecting cases).  This rule prohibits testimony that "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law," or testimony that "determine[s] the outcome of the case."  *Id*. at 392 (internal quotation marks omitted).   Experts may, however, "testify about regulatory frameworks, rules, purposes, and background," including "'background concerning the meaning of terms, the procedures which are followed[, and]

opinion[s] as to the reason for these procedures.'" *Id*. at 391 (quoting *United States v. Bilzerian*, 926 F.2d 1285, 1294–95 (2d Cir. 1991)).

Here, by stating that the Expert would opine that USC's practice of filling prescriptions for the Drug listing the Veterinarian's name "does not alone reflect the issuance of a lawful prescription," the Government's expert disclosure could be read to anticipate expert testimony that is impermissible because it states a legal conclusion that the Veterinarian's prescriptions were in fact illegal. (Expert Disclosure 2.) However, the Government states in its opposition brief that "Dr. Mongeluzzi would not testify that anyone violated the law," and instead would "help explain the circumstances under which veterinary prescriptions are considered valid, *i.e.*, issued 'in the course of the veterinarian's professional practice.'" (Gov't Opp'n 34.) In other words, Dr. Mongeluzzi's testimony will explain—based on her clinical and FDA experience— the types of conduct that is within a veterinarian's professional practice, including developing a VCPR. Given this context, the Expert's anticipated testimony that certain practices would "not alone" be consistent with a valid prescription/VCPR reflects the Expert's experiences as a clinician, not a legal conclusion that any participation Glover may have had with the Veterinarian's or USC's practices violated the law.

Accordingly, Glover's motion to preclude the expert testimony is DENIED.

### K. *Summary Charts and Witnesses*

Finally, noting that the Government frequently calls agents or U.S. Attorney's Office paralegals as witnesses to read summary charts of electronically stored information admitted under Federal Rule of Evidence 1006, Defendant requests that I order the Government to disclose any summary charts and testimony in advance of trial. (*See* Def. Mot. 37–41.) The Government states that it will provide a copy of any summary charts and any statements of the

associated summary witness to the Defense ahead of trial. (*See* Gov't Opp'n 36–37.) The Defense's motion is therefore DENIED as moot.

### IV.    <u>Conclusion</u>

For the foregoing reasons, and consistent with this Opinion & Order, the Government's motion *in limine* is GRANTED IN PART and DENIED IN PART, and Defendant's motion *in limine* is GRANTED IN PART and DENIED IN PART. I will address any remaining disputes at the pretrial conference.

The Clerk of Court is respectfully directed to terminate the pending motions at Docs. 29 and 30.

SO ORDERED.

Dated:  June 3, 2025
       New York, New York

_____
Vernon S. Broderick
United States District Judge