UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

v.

SAM GLOVER

Defendant.

Case No. 24 Cr. 370 (VSB)


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT SAM GLOVER'S
POST-TRIAL MOTION FOR JUDGMENT OF ACQUITTAL**


MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400

*Counsel for Sam Glover*

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ......................................................................................1

STATEMENT OF FACTS ...........................................................................................1

    A.    Procedural History ......................................................................................1

    B.    The Proof At Trial......................................................................................2
        1.    Kyle Zorn Testimony ......................................................................2
        2.    Robert Hopkins Testimony .............................................................6
        3.    Pharmacist Verification Efforts ......................................................9
              a.    Natasha Adkins Testimony ..............................................9
              b.    Rhonda Beck Testimony..................................................13
              c.    Lindsay Richardson Testimony .......................................17
        4.    Other Arkansas Board of Pharmacy Evidence..............................18
        5.    Other FDA Evidence......................................................................19

    C.    Jury Instructions.......................................................................................20

ARGUMENT ...........................................................................................................21

I.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL............................21

    A.    Legal Standard .........................................................................................21
        1.    Rule 29 ..........................................................................................21
        2.    Conspiracy to Misbrand Under the Federal Food, Drug and
              Cosmetic Act................................................................................23

    B.    Discussion ................................................................................................24
        1.    The government's first basis relied on circular reasoning and invited the
              jury to conflate separate elements of the charged crime............................28
        2.    The government's second basis was similarly flawed...............................31
        3.    The government's allegation of a cover-up repeatedly mischaracterized
              the evidence and resorted to impermissible speculation...........................32
        4.    Neither Zorn nor Hopkins testified that the object of the conspiracy
              was to defraud the FDA or the Arkansas Board of Pharmacy..................37
        5.    The government's final attempt to conflate and confuse the issues
              before the jury failed................................................................................37

CONCLUSION........................................................................................................41

i

# TABLE OF AUTHORITIES

## CASES

*Chiarella v. United States*,
  445 U.S. 222 (1980)......................................................................................... 33, 34

*Ciminelli v. United States*,
  598 U.S. 306 (2023)......................................................................................... 33, 34

*Jackson v. Virginia*,
  443 U.S. 307 (1979)............................................................................................... 21

*Langston v. Smith*,
  630 F.3d 310 (2d Cir. 2011)................................................................................. 23

*McCormick v. United States*,
  500 U.S. 257 (1991)......................................................................................... 33, 34

*United States v. Autuori*,
  212 F.3d 105 (2d Cir. 2000)................................................................................. 21

*United States v. Azocar*,
  21 Cr. 379 (VSB), 2025 WL 1463088 (S.D.N.Y. May 22, 2025)......................... 21

*United States v. Bufalino,*
  285 F.2d 408 (2d Cir. 1960)................................................................................. 22

*United States v. Bullock*,
  550 F.3d 247 (2d Cir. 2008)................................................................................. 21

*United States v. D'Amato*,
  39 F.3d 1249 (2d Cir. 1994)........................................................................... 22, 23

*United States v. Defendant(s)*,
  Case No. 09 Cr. 609 (GAF), 2011 WL 13196436 (C.D. Cal. Jan. 5, 2011).............. 25, 26, 38

*United States v. Guadagna*,
  183 F.3d 122 (2d Cir. 1999)................................................................................. 21

*United States v. Indus. Lab'ys Co.*,
  456 F.2d 908 (10th Cir. 1972)............................................................................. 24

*United States v. Jones*,
  393 F.3d 107 (2d Cir. 2004)................................................................................. 22

*United States v. Lorenzo*
  534 F.3d 153 (2d Cir. 2008)........................................................................... 23, 32

*United States v. Mackey*,
   No. 23-7577, 2025 WL 1888250 (2d Cir. July 9, 2025)........................................ 22

*United States v. Mariani*,
   725 F.2d 862 (2d Cir. 1984)........................................................................... 21

*United States v. Mitcheltree*,
   940 F.2d 1329 (10th Cir. 1991 ......................................................... 24, 29, 40

*United States v. Mulheren*,
   938 F.2d 364 (2d Cir. 1991) ............................................................... 22, 23

*United States v. Navarro*,
   551 F. Supp. 3d 380 (S.D.N.Y. 2021)....................................... 24, 31, 40

*United States v. Pauling*,
   924 F.3d 649 (2d Cir. 2019).......................................................... 22, 23, 32

*United States v. Reyes*,
   302 F.3d 48 (2d Cir. 2002).............................................................. 21

*United States v. Rodriguez*,
   392 F.3d 539 (2d Cir. 2004) ......................................................... 23

*United States v.*
   807 F.3d 508 (2d Cir. 2015)......................................................... 22, 23, 30

*United States v. Vernace*,
   811 F.3d 609 (2d Cir. 2016)................................................................. 22

**STATUTES**

21 U.S.C. § 333(a)(2).......................................................................23, 24

## PRELIMINARY STATEMENT

Defendant Sam Glover respectfully submits this Memorandum of Law in support of his motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. The government failed to introduce sufficient evidence to prove beyond a reasonable doubt that Mr. Glover acted with the intent to defraud or mislead the Food and Drug Administration ("FDA") or the Arkansas Board of Pharmacy ("ABOP"). The Court should enter a judgment of acquittal.[1]

## STATEMENT OF FACTS

### A.    Procedural History

On or about July 9, 2024, a grand jury in the Southern District of New York returned a one-count indictment ("Indictment") that charged Sam Glover with conspiring to deliver and introduce for delivery into interstate commerce a misbranded and adulterated drug in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) and 18 U.S.C. § 371. ECF No. 3. According to the Indictment, from 2015 to 2021, Rob Hopkins, Kyle Zorn, and Sam Glover conspired to distribute omeprazole fenbendazole, an equine ulcer medication, pursuant to fabricated prescriptions, which rendered the drug misbranded and adulterated and in violation of 21 U.S.C. §§ 331(a) and 333(a)(2). ECF No. 3 at ¶¶ 3, 5-6. The Indictment alleged that the co-conspirators caused payments to be made to Dr. William Baker, a Kentucky-based veterinarian, in exchange for using his veterinary credentials in US Compounding's ("USC") recordkeeping software to make it appear as if the ulcer medication was validly prescribed to horses. *Id.* at ¶¶ 3, 4. To conceal these payments, which were based on the volume of prescriptions Dr. Baker prescribed, the co-

---

[1] Mr. Glover does not waive and hereby preserves for appeal all arguments presented to and rejected by the Court pre-trial, including but not limited to arguments presented in Mr. Glover's motions *in limine* and other pre-trial motions; all arguments presented to and rejected by the Court during the trial, including but not limited to all evidentiary objections presented to and rejected by the Court; all jury instructions requested by the defense but rejected by the Court; and all objections to jury instructions given by the Court.

conspirators allegedly caused USC's parent company, Adamis Pharmaceuticals ("Adamis"), to enter into a "sham" consulting agreement with Dr. Baker pursuant to which the payments appeared to reflect an hourly fee for consulting services. *Id.* at ¶ 4.

Trial commenced on June 16, 2025 and concluded on June 27, 2025. At the close of the government's case, the defense moved for a judgment of acquittal under Rule 29 of the Federal Rules of Criminal Procedure. Tr. at 1470:5-25. The Court denied the motion. Tr. at 1473:24-1474:25. The jury returned a verdict of guilty. ECF No. 81.

### B.    The Proof At Trial

The Indictment charged a conspiracy to distribute "a *particular* adulterated and misbranded equine drug (the 'Drug')" that commenced in 2015 and involved fabricated prescriptions in the name of a single veterinarian. ECF No. 3 at ¶ 3 (emphasis added), ¶ 5. That case would have been a loser for the government. Therefore, over defense objections, *see* Tr. at 1375:20-1376:18; ECF No. 32 at 32-34, the government's theory at trial morphed into an ill-defined conspiracy among seemingly everyone ever copied on a corporate email, that began four years earlier, in 2011, and involved, at different times, different variations of compounded omeprazole products, and three different veterinarians. In short, the "conspiracy" described at trial existed only where and when it served the government's purposes and it defrauded nobody.

The evidence relevant to this motion is summarized below.

#### 1.    Kyle Zorn Testimony

Former USC sales representative Kyle Zorn testified pursuant to a cooperation agreement. Tr. at 116:24-117:1. The evidence showed that Zorn is a "pathological liar." Tr. at 938:9-10. Zorn testified that, "by the letter of the law," he was guilty of a "conspiracy to misbrand" and that he committed that crime with Sam Glover from "as early as 2011" through

2021.  Tr. at 116:22-117:15.  Zorn did not testify that the object of the conspiracy was to defraud or mislead the FDA or the ABOP.

According to Zorn, the alleged conspiracy focused on USC's horse ulcer medications, including omeprazole sucralfate, omeprazole ranitidine, and omeprazole fenbendazole.  Tr. at 117:24-118:7.  Zorn testified that he, Sam Glover, and others conspired to misbrand drugs by selling them "without … direct client-patient relationships with veterinarians that were not seeing the horses and establishing those relationships."  Tr. at 118:12-16.  Zorn said the alleged conspiracy included three veterinarians—Drs. Rick Pelphrey, Greg Fox, and Bill Baker.  Tr. at 118:17-119:3.  Zorn "never knew the specifics of the arrangement" between Dr. Pelphrey and USC and did not recall when the relationship ended.  Tr. at 127:5-11, 128:24-129:1.  Zorn "believe[d]" Dr. Fox was compensated by commission.  Tr. at 129:20-130:1.  He said Fox's arrangement eventually came to an end, but provided no details as to when, how, or why.  Tr. at 133:13-18.

With respect to Dr. Baker, Zorn testified that he or one of his "17 or 18" sales reps would place orders under the so-called Dr. Baker deal by calling the USC customer service department or emailing orders that were then processed by the pharmacy.  Tr. at 137:15-138:4, 122:20-21.  Zorn explained that emailed orders under the Dr. Baker deal would be signified by the name "Dr. Baker in parentheses, with the rep's initial" and that "Sam put that there so that accounting would know how to pay the reps properly."  Tr. at 138:5-18.

The government elicited general testimony from Zorn on a variety of topics.  For example, Zorn described generally how he would make sales pitches to customers under the Dr. Baker deal, and said that "Sam would be there on some of these."  Tr. at 140:11-23; *see also* Tr. at 182:8-183:12 (describing "typical" sales pitch during the period 2015 to 2021).  Zorn also

answered questions about rodeo horses, testifying that USC sold omeprazole products to rodeo horses but that, to his knowledge, Dr. Baker did not travel out west to treat them. Tr. at 141:17-143:5. Zorn said that he discussed the "rodeo accounts" with Sam, but the government elicited no testimony as to the substance of the alleged conversation. Tr. at 143:6-7. Zorn was also shown emails relating to samples of omeprazole fenbendazole provided to customers at no charge, and testified that Sam approved the samples. GX 2501-2511; Tr. at 189:21-192:24.

Zorn was shown emailed orders that Sam was copied on that were supposedly made pursuant to the so-called Dr. Baker deal. *See, e.g.*, GXs 122, 124, 125. He testified that, in addition to these orders, there were thousands of orders on which Sam was *not* copied. Tr. at 355:9-11. Zorn was also shown certain documents relating to commission payments to Dr. Baker, *see, e.g.*, GX 112, GX 114, GX 140, and testified that he spoke to Sam about issues regarding delayed payments to Dr. Baker. Tr. at 216:7-15. Zorn testified that he discussed his monthly sales numbers with Sam. Tr. at 221-223:10, 283:8-18; *see also* GX 2401, 2402. The government elicited no details about the substance of those conversations.

Zorn testified that less than 10% of the omeprazole prescriptions sold under the Dr. Baker deal involved a stomach scope of the horse. Tr. at 165:6-8. He also confirmed that a stomach scope is not required for a veterinarian to prescribe omeprazole fenbendazole. Tr. at 378:23-25. As to the remaining 90% of prescriptions that USC shipped out under Dr. Baker's license, Zorn testified that "a majority" had no relationship with Dr. Baker. Tr. at 165:9-14. The government introduced no evidence that Zorn ever discussed these estimates with Sam. Regardless, per Zorn, approximately 10% of scoped horses and a minority of the remaining 90% of horses had a relationship with Dr. Baker as a vet.

In response to questions about concerns raised by USC pharmacists in 2020, Zorn testified that he misled the pharmacists on two occasions. S*ee* GX 167; Tr. at 291:13-293:16; GX 2524; Tr. at 295:8-12. The government introduced no evidence that Zorn discussed either of these deceptions with Sam, who was on vacation at the time. *See* GX 170. After August 2020, Zorn testified that the structure of the so-called Dr. Baker deal changed. Tr. at 308:16-24, 309:6-16. He said that the changes were made "[b]ecause of the concerns that the pharmacists had raised." Tr. at 310:11-19. The only direct evidence of Sam's involvement in Dr. Baker orders after the summer of 2020 was a January 2021 text message from Zorn to Sam, head technician Clay Sutherland, and pharmacist Celeste Davis relating to a single order for a trainer named John Kimmel. *See* GX 212. Zorn testified that Dr. Baker was not the treating vet for Kimmel, but offered no evidence that he ever discussed that fact with Sam. Tr. at 314:16-315:4.

Zorn did not testify that the object of the alleged conspiracy was to defraud or mislead any regulator. He referenced the FDA or the ABOP three times during his testimony. First, Zorn testified that he discussed the 2015 FDA inspection of USC (on matters unrelated to omeprazole prescriptions) with Sam, and that Sam informed him that he had met with the FDA inspectors. Tr. at 146:19-147:3. Zorn also testified to the impact of the inspection on USC's business. Tr. at 147:5-8. Second, Zorn addressed a text conversation with Sam about a message that Zorn was planning to send to his sales reps about the FDA accreditation process and how the reps should explain the difference between USC and other compounders. *See* GX 701F. Zorn said that Sam explained to his team the "verbiage that we were allowed to use out in the field . . . and Sam wanted to make sure that the words were correct and not mis-skewed." Tr. at 285:6-15. Third, Zorn testified that he discussed the legality of "the Dr. Baker 20 percent deal" with Sam, and that during this undated conversation Sam said that "it wasn't that big a deal. That the worst

case [was] we would get a slap on the wrist by the state board of pharmacy." Zorn testified that

he understood Sam to mean that the worst-case scenario was that USC "would no longer be able

to do the Dr. Baker deal." Tr. at 145:23-146:16.

### 2. Robert Hopkins Testimony

Former Adamis Chief Financial Officer Robert Hopkins also testified pursuant to a

cooperation agreement. Tr. at 926:9-11. Hopkins testified that he entered into a conspiracy to

distribute misbranded drugs with Sam and others, including Adamis CEO Dennis Carlo, USC

founder Eddie Glover, USC CFO Dawn Bramlett, and Kyle Zorn. Tr. at 821:12-16. Zorn did

not testify that Carlo, Eddie Glover, or Bramlett were part of the alleged conspiracy. Hopkins

said that USC and Adamis paid Dr. Baker a commission "because he was allowing us to use his

license to write prescriptions for horses he was not seeing." Tr. at 821:4-6. Hopkins did not

testify that the object of the conspiracy was to defraud or mislead the FDA or the ABOP.

Hopkins testified that after Adamis's acquisition of USC, he and other Adamis executives

placed "extreme pressure" on USC's veterinary sales business, headed by Sam. Tr. at 827:1-21.

Hopkins said that he spoke with Sam in August 2016 and explained that Adamis was canceling

an agreement between USC and Dr. Baker's wife because Hopkins viewed the agreement as a

way to pay a direct kickback to a veterinarian, which Hopkins believed was illegal. Tr. at

831:15-832:19. USC made no payments to Dr. Baker's wife pursuant to that agreement. Tr. at

983:7-10. Hopkins testified that he told Sam that as a public company, Adamis "could not have

a document that would be discoverable through audit or SEC review on its books." Tr. at 832:5-

7. Hopkins explained that Adamis was required to disclose all significant contracts in its public

filings and that the agreement with Dr. Baker's wife would be available to the public, the SEC,

and Adamis's auditors "so we just couldn't have it in there." Tr. at 832:10-14.

Notwithstanding his stated concern for having an illegal contract on Adamis's books and records, Hopkins testified that immediately thereafter, at the direction of Adamis CEO Dennis Carlo, he came up with the idea for a consulting agreement with Dr. Baker that would "hide and mask" that USC's payments to Dr. Baker were really for writing prescriptions for horses that he wasn't going to see. Tr. at 832:22-835:21. The consulting agreement stated that Baker would be paid an hourly rate for studies and evaluations regarding certain equine drugs, when in reality, he was paid a ten percent commission on sales. Tr. at 842:1-3; 856:25-857:15. As Chief Financial Officer, Hopkins proceeded to allow Adamis to keep that contract on its books and records. Tr. at 858:7-9. Hopkins testified that he told Sam that a consulting agreement was something he had "used in [his] previous health care experience" to "pay physicians for non-prescription activities" and that it was permissible for Adamis to pay Dr. Baker on an hourly basis. Tr. at 834:7-9, 835:5-7. Hopkins suggested that Zorn was part of this alleged conversation, *see* Tr. at 833:21-23, but the government elicited no corroborating testimony from Zorn.

Hopkins did not testify that the consulting agreement was a way to hide the arrangement from the FDA or the ABOP, or that he and Sam ever discussed such a purpose. Rather, Hopkins testified that Sam told him that the consulting agreement could give USC a competitive advantage because certain vets preferred FDA-approved products over compounded products. Tr. at 836:3-837:16. Hopkins was also shown emails relating to payments to Baker and testified that Sam was copied on some of Baker's invoices. Tr. at 859:8-12; *see, e.g.*, GXs 130 and 131.

The government elicited testimony from Hopkins that, starting in spring 2020, he spoke with Sam about pharmacists' efforts to verify Dr. Baker prescriptions. Tr. at 883:6-10; *see generally* Tr. at 883:11-891:17; *see also* GXs 159, 165, 170. For example, after Rhonda Beck contacted customers who responded that they did not know Dr. Baker, Hopkins testified that he

7

instructed Sam that "everybody had to get their stories straight" and that Zorn and his sales reps should tell the owners and trainers that Dr. Baker was their prescribing veterinarian. Tr. at 890:11-891:18.  That is, Hopkins, an individual so concerned about secrecy that he instructed Sam and Zorn to communicate via Signal, *see* Tr. at 904:3-907:8, also apparently instructed them to disclose a criminal conspiracy to customers involved in the Dr. Baker deal so that they knew their prescriptions were coming from a vet who supposedly had never examined their horses.

The government asked Hopkins about an alleged conversation with Sam in June 2020 that concerned potentially replacing Rhonda Beck as the pharmacist-in-charge at USC.  Tr. at 907:9-911:12.  Hopkins testified that by early August 2020, or just over a month later, "we were trying to retain Rhonda [Beck] Johnson as the PIC."  Tr. at 925:15-16.  That would have been nearly five months after Beck and other USC pharmacists began verifying Dr. Baker prescriptions in March 2020, and, according to Hopkins, uncovering the alleged criminal conspiracy.  Tr. at 925:15-16; Tr. at 883:3-10.

With respect to the AZOVA system, Hopkins testified that Beck "did not want the Azova system to be installed."  Tr. at 925:1-2.  However, according to former USC pharmacist Natasha Adkins, *it was Beck and her fellow pharmacists who proposed that AZOVA be implemented* as the solution to ongoing prescription issues.  Tr. at 650:3-5.  Hopkins testified that he discussed preparing for the August 6, 2020 ABOP hearing regarding AZOVA with Sam, but the government, again, did not elicit any details as to the substance of that alleged discussion.  Tr. at 915:13-20.  Hopkins confirmed that he texted Sam after the hearing that "Rhonda lost today," *see* GX 202B, but did not testify that he shared any details from the hearing with Sam.  Tr. at 924:6-925:17.

8

Hopkins further testified that the Dr. Baker consulting agreement was ultimately terminated in July 2020 because Beck threatened to resign. Tr. at 927:13-928:21. He said that, between July and August 6, 2020, he participated in a Signal conversation with Sam and Zorn in which he told them that he did not want to hear anything about continuing with the Dr. Baker deal after the termination of the consulting agreement. Tr. at 927:22-928:24. Hopkins did not provide any details about this supposed plan, and Zorn did not corroborate this alleged Signal conversation. The notion that Hopkins had withdrawn from the conspiracy between July and August 6, 2020 undercuts the government's theory that Hopkins, Zorn, and Sam plotted to use AZOVA to perpetuate the alleged scheme, that Hopkins participated in an effort to defraud the ABOP regarding USC's intended use of AZOVA at the August 6 hearing (he never testified to that), or that Hopkins' text message to Sam that "Rhonda lost today" (GX 202B) was in furtherance of an ongoing criminal conspiracy. By that time, Hopkins testified that he wanted nothing to do with the alleged Dr. Baker deal. Tr. at 928:2-24.

### 3. Pharmacist Verification Efforts

The government presented testimony and documentary evidence relating to efforts by USC pharmacists to verify prescriptions from Dr. Baker (amongst other vets) beginning in March 2020.

#### a. Natasha Adkins Testimony

Natasha Adkins testified that she was present for "probably five meetings" with Sam and others in which pharmacists raised concerns relating to Dr. Baker and USC's process for ordering and distributing prescriptions. Tr. at 563:9-15. Adkins said the concerns included the volume of Dr. Baker orders, the fact that USC was sending prescriptions to over thirty states under his name, and Baker's age and ability to travel to examine his patients. Tr. at 563:16-

565:14.  Adkins said at least four times during her testimony that when these issues were raised

with Sam, he responded that Dr. Baker was seeing the horses and that horses often traveled with

their trainers and not with their owners.  *See, e.g.*, Tr. at 565:17-23, 587:16-20, 606:12-15,

618:13-15.  Adkins also testified that Sam told the pharmacists that Dr. Baker had scoped many

of the horses that he was prescribing medication to.  Tr. at 620:9-12.

Adkins testified that she and other pharmacists began verifying prescriptions in the first

half of 2020.  Adkins was shown GX 158, a March 2020 email between several pharmacists and

sales personnel on this topic, which confirms that the pharmacists verified *all* email orders

received at this time, and not just those from Dr. Baker.  *Id.* at 6.  Sam apologized in the email

exchange for not doing a good enough job explaining the prescription verification process to the

sales team.  *Id.* at 3.  Sam then wrote, "I will let Rhonda explain this further but we are verifying

all new scripts.  That practice started in the last month or so."  *Id.*  Adkins was asked why

Rhonda Beck sent an email explaining the prescription verification process, and she responded

that USC pharmacists had started to verify all Dr. Baker orders and, "I guess that didn't get

communicated."  Tr. at 596:6-12.  GX 158, however, made no reference to Dr. Baker and related

to an order for Dr. Dennis Farrell.  GX 158 at 5.

The government then jumped to an August 25, 2020 email exchange between Sam, Beck,

and several other USC pharmacists and employees.  *See* GX 173.  Beck reported in that email

that Dr. Baker's wife told a pharmacist that Dr. Baker was in the hospital and "not doing well."

GX 173 at 1-2.  Beck noted that USC had just received new prescriptions from Dr. Baker and

stated that the pharmacists "do not feel comfortable verifying prescriptions until Dr. Baker has

recovered enough to resume practicing and prescribing."  *Id.*  Beck asked if "there is a vet that is

covering for Dr. Baker during this time that we could speak to regarding the prescriptions?"  *Id.*

10

at 2.  This was nearly three weeks after Beck had resigned from USC.  Tr. at 1173:15-16.  Sam

responded that one of Dr. Baker's vets was "working a big horse show in Louisville right now.

That's why we sent that big order to Kentucky.  I will tell them to order from one of their other

pharmacies until Dr. Baker is out of the hospital and doing better."  *Id.* at 1.

      The government next asked Adkins about GX 167, a June 2020 email addressed to Zorn

and copying Sam and others, that was sent while Sam was on vacation.  The government asked

Adkins broadly if she discussed the issue of customers not knowing Dr. Baker with Sam.  Tr. at

617:20-21.  Adkins testified that she and the other pharmacists told Sam about this multiple

times "[i]n those same meetings" and that Sam responded that "these horses would travel with

their trainers sometimes and go to barns, and that maybe the owners didn't know who the vets

were that saw them at the barns."  Tr. at 618:13-15.  Adkins then testified that when she raised

the issue of Dr. Baker being licensed in five states with Sam, Sam responded that "these horses

travel to barns, that Dr. Baker was seeing them, that he was scoping them" and that the

pharmacists "just didn't know, [they] didn't understand how it all worked."   Tr. at 619:2-620:7,

620:9-12.

      Adkins was next asked about GX 162, a May 29, 2020 email from Beck asking for an

explanation of the Dr. Baker deal after, according to Adkins, Zorn mentioned the Dr. Baker deal

on a conference call.  Tr. at 641:14-18.  Adkins testified that after Beck sent this email, she,

Beck, and Sam attended a meeting where Dawn Bramlett stated that the Dr. Baker deal was a

consulting agreement between Baker and USC for him to consult on scope studies that the

company was performing for omeprazole fenbendazole.  Tr. at 642:25-643:10.  Beck, on the

other hand, did not recall Sam or even Adkins being present at this meeting.  Tr. at 1163:22-

1164:2.  Adkins then testified that she or "we" told Sam that they knew that there was no

consulting agreement, that Dr. Baker was being paid so sales reps could put in orders with his name on them, and that they would no longer be filling Dr. Baker prescriptions.  Tr. at 643:16-646:25.  Adkins said she attended another meeting with Sam and others in August 2020, after the Dr. Baker consulting agreement had been terminated, and stated that the volume of prescriptions from Dr. Baker had not changed and that the pharmacists were still having problems verifying them.  Tr. at 648:24-649:7.

Adkins testified that in July and August 2020, she and other pharmacists told Sam that they "had done some research" and "found a pretty easy to use, pretty cheap electronic prescribing system" called AZOVA, and that it was the pharmacists who "proposed that as a solution."  Tr. at 650:3-9.  Adkins testified that the pharmacists hoped that AZOVA would ensure that Dr. Baker, and not the sales reps, were entering prescriptions.  Tr. 650:12-13.  That way, the pharmacists "wouldn't have any question about the legality" or "source" of the prescriptions, and would "feel comfortable filling them."  Tr. at 650:13-16.  Adkins testified that she and the other pharmacists learned that sales reps were invited to training calls for AZOVA. The pharmacists disagreed because they didn't want the sales reps "to be the ones entering the orders in the system."  Tr. at 651:15-18.

Adkins testified that Sam stated that USC would get approval from the ABOP for sales reps to have access to AZOVA.  Tr. at 652:2-3.  That is specifically what Becca Mitchell, USC's regulatory consultant, requested of Dr. John Kirtley by email in July 2020 and what led to the August 6, 2020 ABOP hearing.  *See* GX 184 at 2.  Adkins next testified about an August 13, 2020 meeting at USC that took place after the ABOP hearing.  Adkins said that Beck reported that during the ABOP hearing first, that "her mic was muted the whole time and that she couldn't speak for herself," second, that she (Beck) was misrepresented at the meeting, and third, that

USC "misrepresented to the board what the sales reps' involvement in the Azova system would be." Tr. at 658:7-11. As to the first point, Dr. Kirtley confirmed during his testimony that every participant controlled their own mute button and had the ability to speak during the August 6 hearing. Tr. at 799:17-20. As to the second point, Adkins said that Beck told the meeting participants "that it was represented from U.S. Compounding to the board that she was agreeable to the sales reps having access to the Azova system." Tr. at 658:23-25. The video excerpts from the ABOP hearing, however, made no mention of Beck or that she was agreeable to sales reps having access to AZOVA. Nor did Beck corroborate that she ever said this at the August 13 meeting. As to the third point, Adkins did not testify that Sam had any involvement in what USC lawyer Rachael Pontikes did or did not say at the ABOP hearing.

Adkins also testified that Beck told Sam at the August 13 meeting that she understood that sales rep involvement in AZOVA "would be just like it had always been, and the sales reps would enter their orders over here in whatever state they're in, and he [Dr. Baker] would be over wherever he is and he would just push a button and ... electronically ... sign the prescription." Tr. at 659:22-660:3. Once again, Beck did not corroborate that she ever said this to Sam at the meeting. Instead, as discussed further below, Beck testified that she told Sam that the ABOP was not told at the August 6 hearing that "the pharmacists had to give the sales reps prescriptive authority, which was the issue that I had." Tr. at 1175:18-22. Beck made no mention of telling Sam that she knew that sales rep involvement in AZOVA "would be just like it had always been," as Adkins claimed.

### b.    Rhonda Beck Testimony

Rhonda Beck testified that she trained USC sales representatives on certain topics from 2018 to 2020, and that Sam sat in on some of those trainings. Tr. at 1122:17-24. With respect to

13

GX 105, a USC training deck, Beck confirmed that Sam "was present at some of the trainings where [she] presented the information in these training materials." Tr. at 1123:8-10. The slide deck stated that USC's 503A pharmacy was regulated by state boards of pharmacy, and that the FDA had published guidance documents that listed the rules for such facilities. GX 105 at slides 4 and 5. Beck was also asked about the 2015 FDA inspection and its impact on USC. Tr. at 1127:16-1139:21; *see also* GX 214A.

Beck testified that she explained to Sam and others in early 2020 that emailed prescriptions are not valid. Tr. at 1146:15-1147:20. Prior to this period, emailed prescriptions were permitted by the pharmacist-in-charge and USC's corporate policies. Tr. at 1254:20-1255:6; DX 388. Beck testified that after she brought this issue to Sam's attention, he responded that he would "communicate to the sales reps that the e-mails had to be validated." Tr. at 1149:21-24. Beck said Sam also expressed "some concern of loss of business due to the time it would take the pharmacist to validate those prescriptions." Tr. at 1149:25-1150:8. Beck was asked about issues that arose as she and USC pharmacists began to verify emailed prescriptions. She testified that she raised with Sam that certain owners or barn employees did not know Dr. Baker when pharmacists tried to validate orders. Tr. at 1156:5-24. Beck said she raised the issue with Sam at leadership meetings and other in-person meetings between April and June 2020, as well as in more informal communications. Tr. at 1157:4-1158:4. Beck recalled one particular call with Sam and Kyle Zorn in which Zorn mentioned the Dr. Baker deal and said that he was concerned about the loss of business due to the delay in the verification of prescriptions. Beck said that no explanation was provided about the Dr. Baker deal except that Baker was a source of revenue and brought in a lot of business. Tr. at 1159:9-1160:13.

Beck was asked about a May 29, 2020 email in which she asked for an explanation of the Dr. Baker deal.  GX 162.  She testified that Dawn Bramlett provided an explanation at a June 2020 leadership meeting and said that there was a consulting contract between USC and Dr. Baker.  Tr. at 1162:3-21.  Beck testified that she, Bramlett, and Ron Antes were the only attendees of that meeting that she could recall.  Tr. at 1163:22-1164:2.  Beck also testified about research that her team conducted into what states Dr. Baker was licensed in.  Beck said that she told Sam at a meeting on an unknown date that the pharmacists could only see five states that Baker was licensed in, not twenty-five as Sam had stated during the meeting.  Tr. at 1165:18-1166:3.  Beck also testified about two emails she sent to several USC employees about a customer who was not familiar with Dr. Baker when pharmacists contacted the farm about a recent order.  *See* GXs 166 and 167.  Sam was on vacation at the time.  GX 170.

Beck was next asked about AZOVA.  She testified that AZOVA was not implemented in June or July 2020 due to differing opinions within USC about how to use the software.  Tr. at 1169:16-25.  Beck said that Sam and Dawn Bramlett wanted sales reps to have access to the system, but she disagreed because an order could only be submitted by someone with prescriptive authority and "the pharmacists did not want to give prescriptive authority to sales reps."  Tr. at 1170:1-10.  Beck said she explained to Sam and the executive leadership team that only a physician or a physician's representative could have prescriptive authority and that it was not legal for a sales rep to have such authority.  Tr. at 1170:20-1171:1.  To resolve this disagreement and make the "pharmacist[s] feel comfortable with the Azova system," Beck said that the USC leadership team decided to request a meeting with the ABOP to get approval for sales reps "inputting information" into the AZOVA system.  Tr. at 1171:16-18.

Beck testified that she personally called a member of the ABOP to discuss the issue of sales reps inputting prescriptions into the AZOVA software, *see* Tr. at 1172:12-13. However, John Kirtley from the ABOP testified that he never received such a call. Tr. at 798:11-18. Beck also testified that she attended the formal board hearing by Zoom, but she did not say anything because her microphone was muted. Tr. at 1173:9-10, 1172:12-13. Beck said she resigned the day after the board meeting because "the information that [she] took or [she] would have taken to the board meeting was not what was discussed. [She] was misrepresented during that meeting." Tr. at 1173:15-20. Beck said that during a meeting with Sam and several other USC employees on August 13, 2020, she explained the reason for her resignation "is because [she] was misrepresented on that board meeting. As the pharmacist-in-charge, [her] voice was not heard in that meeting. And [she] did not agree with the stance the board took." Tr. at 1175:9-13. Beck testified that the misrepresentation was that "it was presented as though the sales reps would act as scribes or they would gather information" and it was "never told to the state board of pharmacy that the pharmacists had to give the sales reps prescriptive authority, which was the issue that [she] had." Tr. at 1175:18-22.

Beck testified that pharmacists raised concerns at the August 13 meeting that they could lose their licenses if illegal prescriptions were shipped. Beck said Sam responded that the ABOP had approved it—presumably sales rep involvement in the AZOVA system—so the pharmacists should not be worried about losing their licenses. Beck also testified that Sam said that if the pharmacists did not like it, they could find another job. Tr. at 1179:10-13. According to Beck, this reaction was uncharacteristic for Sam. Tr. at 1232:19-21.

Beck testified that she only began raising issues about Dr. Baker with Sam in June 2020, Tr. at 1223:16-17, and that USC continued to process prescriptions after June 2020 because some

were refills that had already been verified "or if the pharmacist talked directly to Dr. Baker on certain instances the prescriptions would be filled." Tr. at 1182:6-11. Beck confirmed that it was customer service and the pharmacists' responsibility to verify a veterinarian's licensing status, not the sales department. Tr. at 1207:13-1208:15; *see also* DX 325 at 1. She also confirmed that Sam never prevented her or the pharmacists from verifying prescriptions. Tr. at 1215:25-1216:2. Beck also did not testify that Sam forced the pharmacists to approve any orders. Nor did Sam fire Beck. Tr. at 1194:24-25.

### c.    Lindsay Richardson Testimony

Former USC pharmacist Lindsay Richardson testified that she participated in the effort to verify emailed prescriptions. Tr. at 1247:13-23. Richardson said that she contacted Dr. Baker's office directly, and someone at the office named Christina would verify the prescriptions. Tr. at 1250:24-1251:14. During the August 13, 2020 meeting discussed above, Richardson said Sam shrugged when she told him that Dr. Baker was only licensed in five states, which is consistent with later text communications suggesting that Sam was unaware of that fact prior to the meeting. *Compare* Tr. at 1252:13-25 *and* GXs 201D, 201E. Neither Zorn nor Hopkins testified that the object of the alleged conspiracy was to distribute prescriptions to states in which Dr. Baker was not licensed. Nor was such a conspiracy charged in the Indictment.

Richardson also testified that when she questioned how Dr. Baker could have a relationship with so many horses in so many different states, Sam responded that she did not understand how the racetrack business and racetrack veterinary medicine worked. Tr. at 1253:1-13. Richardson also said that she raised concerns about sales reps entering orders using AZOVA, and Sam responded that USC would have to find a workaround. Tr. at 1253:14-23. This is inconsistent with the chronology of the ABOP hearing held on August 6, 2020. The

17

purpose of that hearing was to review, consider, and ultimately approve USC sales reps entering

orders in AZOVA. *See* GX 184. Richardson also confirmed that she asked about the legality of

emailed orders sometime between 2016 and 2017 while she was working part-time at USC, and

the pharmacist-in-charge told her that was "how the vet prescriptions worked." Tr. at 1254:20-

1255:6. USC's corporate policies permitted vet orders to be submitted by email. *See* DX 388.

### 4.    Other Arkansas Board of Pharmacy Evidence

The government introduced a July 17, 2020 email from USC regulatory consultant Becca

Mitchell to John Kirtley, Executive Director of the ABOP, seeking approval for the company's

use of AZOVA. *See* GX 184. Mitchell's email sought approval for USC sales representatives to

enter orders into AZOVA. *Id*. at 2. The government also introduced a time entry from Mitchell

reflecting a 15-minute "regulatory discussion" with Sam. *See* GX 185 at 56-57. The entry was

dated July 6, 2020—more than ten days before Mitchell's email to Kirtley—and indicated a

discussion about "requesting informal conference with Arkansas BOP to discuss Azova." *Id.*

The government introduced video excerpts from the August 6, 2020 ABOP hearing in

which USC sought approval for AZOVA. GXs 1401-1408. Sam did not attend that hearing or a

two-hour prep session scheduled for the day before and to be attended by company counsel from

Reed Smith, Robert Hopkins, and Rhonda Beck. *See* DX 843. Kirtley testified that attorney

Rachael Pontikes from Reed Smith spoke during the August 6, 2020 hearing on behalf of USC.

Tr. at 748:11-17. Kirtley confirmed his understanding that USC sales representatives would be

inputting prescriptions into AZOVA, and the veterinarian would need to review and approve

those prescriptions. Tr. at 749:3-17. Kirtley said that he was concerned that AZOVA could be

considered a type of inducement for prescribers to use USC. Tr. at 751:11-753:15. The

government introduced no evidence that this concern was ever communicated to Sam. Kirtley

confirmed that he did not have any dealings with Sam in connection with the August 6, 2020

hearing.  Tr. at 794:10-12.  He testified that prior to the August 6 hearing, he did not receive a

phone call from Rhonda Beck and that no one from USC had raised any vet licensing or VCPR

issues with him.  Tr. at 798:11-18.  Kirtley confirmed that he answered questions from

pharmacists all the time and that if a pharmacist believed something was illegal, he or she could

contact Kirtley or the ABOP.  Tr. at 797:14-798:18.

Kirtley confirmed that, at the conclusion of the August 6 hearing, the ABOP approved

USC's use of AZOVA "as a pilot project" on a provisional basis, with a follow-up conference to

be held in six months to discuss feedback on cost-sharing, complaints, or errors that were

reported during the provisional period.  Tr. at 758:12-22.

The government also called Reed Smith attorney David Hartmann to testify, even though

the ABOP hearing was led by Pontikes, who also attended the two-hour prep session with

Hopkins and Beck.  Hartmann testified that, "to the best of [his] recollection," he attended a

meeting with Sam on July 27, 2020.  Tr. at 723:14-15.  The government introduced a calendar

invite for a thirty-minute meeting that listed Hartmann, Sam, and Dawn Bramlett as attendees.

*See* GX 216C.  Hartmann testified that his memory about the meeting was not super clear, and

that he could not be sure how long it lasted.  Tr. at 727:18-24.

### 5.    Other FDA Evidence

Lloyd Payne, a consumer safety officer for the FDA, testified that he conducted an

inspection of USC in 2015.  Tr. at 476:20-21.  Payne testified that the inspection started on

August 10, 2015 and concluded on August 21, 2015.  Tr. at 477:1-2.  He said that his team held

daily meetings with USC leadership throughout the inspection, as well as a closeout meeting at

its conclusion.  Tr. at 479:3-16.  Payne testified that he could not remember whether Sam or

19

Eddie Glover was the younger or the older Glover, *see* Tr. at 483:7-13, but he remembered that Sam "was present on a few of the days" and "at the time of the issuance of the inspectional observations at the close of the inspection." Tr. at 479:21-24. Payne had no further engagement with USC after the closeout meeting. Tr. at 480:24-481:1.

### C.    Jury Instructions

The Court charged the jury prior to the parties' summations. With respect to the object of the charged conspiracy, the Court instructed the jury that the government was required to prove that Sam acted with an intent to defraud or mislead. The Court charged the jury as follows:

> To act "with intent to defraud" means to act with the specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself. The intent must be connected—related in time, causation, or logic—to the commission of the misbranding or adulteration offense that is the subject of the charged conspiracy.
>
> . . .
>
> To act with "intent to mislead" means to act with the specific intent to create a false impression by misstating, omitting, or concealing material facts. It is not necessary, however, to prove that anyone was in fact, misled, as long as it is established beyond a reasonable doubt that the Defendant acted with the intent to mislead.
>
> . . .
>
> "Intent to defraud or mislead" can be demonstrated by evidence of intent to defraud or mislead consumers, state drug regulators, and the FDA.
>
> In addition, the Government need not prove that the intent to defraud or the intent to mislead was the only intent of the Defendant. A defendant may have the required intent even if the defendant was motivated by other lawful purposes as well.

Tr. at 1519:12-1520:22.

*        *        *

## ARGUMENT

### I.    THE COURT SHOULD ENTER A JUDGMENT OF ACQUITTAL

#### A.    Legal Standard

##### 1.    Rule 29

Federal Rule of Criminal Procedure 29(c)(2) provides, in part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal." *See United States v. Azocar*, 21 Cr. 379 (VSB), 2025 WL 1463088, at *6 (S.D.N.Y. May 22, 2025).  A district court may enter a judgment of acquittal under Rule 29 "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt." *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 318-319 (1979)).  In other words, the "evidence that the defendant committed the crime alleged [must be] nonexistent or so meager that no reasonable jury could find guilt beyond reasonable doubt" for a court to acquit.  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).  When making this determination a court cannot usurp the role of the jury or "substitute its own determination of ... the weight of the evidence and the reasonable inferences to be drawn for that of the jury." *Id.* at 129 (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).  The court must "consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted).  A defendant faces a "heavy burden" in meeting the Rule 29 standard.  *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir. 2008).

"Applying this standard does not, however, mean that a reviewing court must affirm all jury verdicts." *United States v. Valle*, 807 F.3d 508, 515 (2d Cir. 2015). "A criminal defendant who challenges the sufficiency of evidence shoulders a heavy burden, but not an impossible one." *United States v. Jones*, 393 F.3d 107, 111 (2d Cir. 2004); *see also United States v. Mackey*, No. 23-7577, 2025 WL 1888250, at *7 (2d Cir. July 9, 2025). Indeed, "[t]his standard does not mean that if there is any evidence that arguably could support a verdict, we must affirm. In any criminal trial there is always some evidence of guilt, otherwise there could not have been a prosecution." *Valle*, 807 F.3d at 515.

On Rule 29 motions, courts are reminded that "in America we still respect the dignity of the individual, and [a defendant] ... is not to be imprisoned except on definite proof of a specific crime." *United States v. Mulheren*, 938 F.2d 364, 368 (2d Cir. 1991) (quoting *United States v. Bufalino,* 285 F.2d 408, 420 (2d Cir. 1960) (Clark, J., concurring)). "[A] conviction based on speculation and surmise alone cannot stand. In particular, the government must introduce sufficient evidence to allow the jury to reasonably infer that each essential element of the crime charged has been proven beyond a reasonable doubt." *United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).

"Where the Government asks the jury to find an element of the crime through inference," however, "the jury may not be permitted to conjecture ... or to conclude upon pure speculation or from passion, prejudice or sympathy." *United States v. Vernace*, 811 F.3d 609, 615 (2d Cir. 2016) (citations omitted). "An inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact that is known to exist. Impermissible speculation, on the other hand, is 'a complete absence of probative facts to support the conclusion reached.'" *United States v. Pauling*, 924 F.3d 649, 656 (2d Cir. 2019)

(internal citations omitted).  Even reasonable speculation is prohibited, which "occurs when the finder of fact concludes that a disputed fact exists that is within the realm of possibility, but the conclusion reached is nevertheless unreasonable because it is not logically based on another fact known to exist."  *Id.* (citing *Langston v. Smith*, 630 F.3d 310, 314, 319 (2d Cir. 2011)).

"[T]he government must do more than introduce evidence 'at least as consistent with innocence as with guilt.'"  *D'Amato*, 39 F.3d at 1256 (quoting *United States v. Mulheren,* 938 F.2d 364, 372 (2d Cir. 1991)).  "If the evidence viewed in the light most favorable to the prosecution gives equal or nearly equal circumstantial support to a theory of guilt and a theory of innocence, then a reasonable jury must necessarily entertain a reasonable doubt."  *Valle*, 807 F.3d at 515 (citing *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008)).  As the Second Circuit has cautioned, while a court is "obliged to view the evidence with all reasonable inferences drawn in the Government's favor, [it] may not permit that rule to displace the even more important rule that all elements of an offense must be proven beyond a reasonable doubt."  *Pauling,* 924 F.3d at 662 (citation omitted).

In short, "'[it] would not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty.'"  *United States v. Lorenzo*, 534 F.3d 153, 159 (2d Cir. 2008) (emphasis in original) (alterations in original) (quoting *United States v. Rodriguez*, 392 F.3d 539, 544 (2d Cir. 2004)).

## 2.    Conspiracy to Misbrand Under the Federal Food, Drug, and Cosmetic Act

A felony misbranding conspiracy under the FDCA requires the defendant to have acted with an intent to defraud or mislead.  21 U.S.C. § 333(a)(2).  Several courts have acknowledged that the intent-to-defraud element is the *essential* element that distinguishes a felony misbranding offense under the FDCA from a misdemeanor.  *See, e.g., United States v. Navarro*, 551 F. Supp.

3d 380, 391 (S.D.N.Y. 2021) (The FDCA "enhances a drug alteration or misbranding offense to a felony in specified circumstances, including (relevant here) where a Defendant commits the FDCA violation 'with the intent to defraud or mislead.'") (citing 21 U.S.C. § 333(a)(2)); *see also United States v. Mitcheltree*, 940 F.2d 1329, 1351 (10th Cir. 1991) ("We are unwilling to blur the distinction between the misdemeanor and felony provisions of § 333(a).  The felony provision requires knowledge of the misbranding and proof of specific intent to mislead or defraud connected to the misbranding violation."); *United States v. Indus. Lab'ys Co.*, 456 F.2d 908, 910-11 (10th Cir. 1972) ("We must hold that it was essential that the jury be told that under § 333(b) intent to mislead or defraud was an essential ingredient.  The jury should have been further directed that it was necessary for it to find that the defendant knew that the several tests had not been made, that Ochs intentionally misrepresented that they had, and that he did so for the purpose of misleading and defrauding the consignee and the Canadian authorities that such several tests had in fact been performed.").

### B.    Discussion

The Court instructed the jury that the intent element that defines a felony misbranding offense under the FDCA requires the government to prove beyond a reasonable doubt that the defendant acted with a specific intent to defraud or mislead.  The Court explained that intent could be demonstrated by an intent to defraud or mislead consumers, state drug regulators, or the FDA.  Tr. at 1519:12-1520:22.  The government did not argue that Sam intended to defraud or mislead consumers, and except for a stray reference to the California Board of Pharmacy, *see* Tr. at 1595:5-6, the government's summation focused exclusively on the theory that Sam intended to defraud the FDA and the ABOP.  The issue presented by this motion is whether the government

presented sufficient evidence to permit a rational jury to find beyond a reasonable doubt that

Sam Glover specifically intended to defraud or mislead either of those two regulators.  It did not.

An analogous case to frame the discussion of the government's evidence is *United States*

*v. Defendant(s)*, Case No. 09 Cr. 609 (GAF), 2011 WL 13196436 (C.D. Cal. Jan. 5, 2011).  In

*Defendant(s)*, the court entered a judgment of acquittal for three of five defendants after finding

that the government failed to introduce sufficient evidence of the defendants' involvement in a

health care fraud scheme executed by two companies, Medcare Plus and Excel Plus, that

employed them as nurses.  At the outset of its Rule 29 decision, the court noted that the alleged

fraud scheme lacked several features typically found in a health care fraud case, commenting:

> (1) the patients were real children who in most cases required around-the-clock
> care; (2) their medical conditions were not only real but dire; (3) the nurse
> employees were real people who provided real services to the families to whom
> they were assigned; (4) the paperwork prepared by the nurse employees was
> thorough, complete and accurate save for the signature; (5) many of the nurse
> employees, though not licensed as LVNs within California, were well qualified for
> the positions they held; (6) none of the patients of the nurse employees suffered any
> injury at the hands of the nurse employees; and (7) to the extent that evidence was
> presented on the subject, the defendants provided quality health care and the parents
> who dealt with the nurse employees held the nurse employees in high regard.  In
> short, the scheme here was technical in nature when compared with the more typical
> case where the patients are fictitious, or the diagnosis is fictitious, or the services
> were not rendered, or the services rendered were medically unnecessary.  Here the
> services were required and were performed, though the technical licensing
> requirement was not met.

*Id.* at *1.  The court granted Rule 29 motions filed by three of the five nurses.  Despite the

government pointing to evidence that at least two of those nurses had admitted to providing

services for which they were not licensed, the court found that the defendants may have

"understood that they were deceiving their patient's families and violating California licensing

law, but the record contains no evidence that they had sufficient knowledge of Medi-Cal billing

procedures to know the consequences of their actions here let alone to further the efforts of their employer to cheat the Medi-Cal program." *Id.* at *5.

The misbranding scheme alleged here contains many of the same elements highlighted as atypical by the court in *Defendant(s)*. As Kyle Zorn and other government witnesses testified, the patients at issue in this case were real, Tr. at 105:22-106:21, 548:25-549:7; the omeprazole fenbendazole distributed by USC was real, Tr. at 105:22-106:21, 548:25-549:9; a substantial number of the clients and patients had legitimate relationships with Dr. Baker, Tr. at 165:9-14; no patients suffered any consequences from the omeprazole fenbendazole other than effective treatment for stomach ulcers, Tr. at 390:12-20, 816:7-9; and omeprazole fenbendazole was less expensive than other horse ulcer medications available to customers, Tr. at 549:10-17. In addition, unlike in *Defendant(s)* and many other health care fraud cases, there was no reimbursement of any kind by the FDA or the ABOP, the two regulators that Sam supposedly intended to defraud or mislead in connection with the alleged conspiracy. Tr. at 1573:19-22.

Broadly, the government's theory of Sam's intent to defraud the FDA was that the agency regulates prescription drugs in America, inspected USC once in 2015, and that Sam was aware of that inspection and the FDA's ability to conduct another inspection. Tr. at 1594:11-1595:6. As to the ABOP, the government's theory was that the ABOP regulates pharmacies licensed in Arkansas, held a hearing to consider an e-prescription software system on August 6, 2020—about nine years after the start of the alleged conspiracy—and was misled by an attorney from Reed Smith at that hearing. Tr. at 1586:2-1588:21.

During its summations, the government told the jury there were five reasons to conclude that Sam acted with an intent to defraud or mislead:

> *First*, the nature of the scheme itself. *Second*, the pharmacists didn't just tell him that these things were happening, they told him that it was wrong. They told him

26

that it was illegal. *Third*, he and his co-conspirators tried to cover up this scheme. Repeatedly. *Fourth*, Kyle and Hopkins told you it was wrong and they told you they committed this crime with the defendant. And, *fifth*, the defendant knew the rules.

Tr. at 1573:23-1574:7.  A close reading of the trial record demonstrates that as to each basis presented to the jury, the government relied on either mischaracterizations of evidence, pure speculation and conjecture, or both.  None of the purported bases presented by the government is supported by sufficient evidence to establish beyond a reasonable doubt that Sam acted with an intent to defraud or mislead the FDA or the ABOP.

Setting aside the government's repeated attacks on defense counsel during its rebuttal summation, the number of misrepresentations and mischaracterizations of evidence by the government was alarming.  Several went to the heart of critical issues in the case.  For example, the government argued to the jury during its rebuttal summation that if Sam Glover:

truly, in good faith, thought that Dr. Baker was seeing horses, you know what would have been less work?  Telling the pharmacists, hey, this guy is scoping horses.  Hey, this guy knows the horses, this is a misunderstanding.  It would have been a lot less work for [Sam Glover] to tell the pharmacists what he apparently believed was the case, which is that there were vet-client-patient relationships.  He didn't do that. He did not do that because he knew he didn't have the proof.

Tr. at 1655:1-11.  According to government witness Natasha Adkins, that is exactly what Sam did each time he was confronted by the pharmacists.  Tr. at 565:17-23 (Sam said that "Dr. Baker would see all these horses at race barns . . . the horses travel and sometimes they're with their trainers and not the owners"); 587:16-20 ("Dr. Baker would see these horses at these barns, and so he could see a lot of horses at one time"); 606:12-15 (Sam "would always say the same things – that Dr. Baker saw them at tracks and barns and whatever"); 618:13-15 ("these horses would travel with their trainers sometimes and go to barns, and that maybe the owners didn't know who the vets were that saw them at the barns"); 620:9-12 ("these horses travel to barns, that Dr. Baker was seeing them, that he was scoping them").

27

The government also told the jury during its rebuttal summation that Adamis's publicly filed plan of merger disclosing USC's commission payments to Dr. Baker proved nothing about Sam's intent and was not worthy of their consideration because there was "no evidence in the record that Sam Glover even saw that document."  Tr. at 1662:19–20.  Of course, when the government asked Rob Hopkins during its re-direct examination whether Sam ever received Defense Exhibit 304, he answered unequivocally, "Yes."  Tr. at 1004:23-24.

As to venue, the government pointed the jury during its rebuttal summation to GX 208L, which it described as "a text message from the defendant to Dawn Bramlett talking about the fact that he is coming to New York for a horse show in order to do his routine sales pitch" and argued "[t]he defendant traveling to New York to sell his product; that's venue."  Tr. at 1670 at 5-8; 1596:16–18.  The government surely is aware that venue is based on judicial districts, not states, and that the horse sale referenced in Sam's text message was in Saratoga, which is located in the Northern District of New York, not the Southern District.  *See* Fasig Tipton, *Catalogue Archives*, https://fasigtipton.com/catalogues/2018 (last visited August 1, 2025).

The government assured the jury that the evidence of guilt in this case was overwhelming, *see* Tr. at 1649:22-24, but it would have had no need to resort to so many mischaracterizations of evidence if that were the case.  When the government presented its five reasons for the jury to find that Sam acted with an intent to defraud, its reliance on mischaracterizations of evidence, speculation, and conjecture did not stop.

> **1.    The government's first basis relied on circular reasoning and invited the jury to conflate separate elements of the charged crime**

In arguing that the nature of the crime itself proves that Sam intended to defraud the FDA or the ABOP, the government repeatedly asserted "that [Sam] obviously knew what he was doing was wrong."  Tr. at 1574:23-24.  The government's argument takes a separate element of

28

the charged crime—knowing and willful membership in the conspiracy—and conflates it with

the intent-to-defraud element.  The government, moreover, did not offer the jury any basis to

conclude that Sam intended to defraud the FDA or the ABOP based on this supposed knowledge

of wrongfulness.  Instead, it just stated in a conclusory and circular manner that because Sam

supposedly knew that the scheme was wrong, he must have intended to defraud the FDA or the

ABOP.  This is especially impermissible where, as here, the intent-to-defraud element is the

essential factor that distinguishes a misdemeanor violation from a felony misbranding

conspiracy.  *See Mitcheltree*, 940 F.2d at 1351.

The government also argued that "every aspect of this crime," including "the fake

consulting agreement, the so-called consulting payments and fraudulent prescriptions" showed

that Sam was "creating a paper trail to mislead the regulators, to keep them from discovering his

crime."  Tr. at 1575:6-11.  This is pure argument.  The government pointed to *no testimony or*

*other evidence* that the "fake" consulting agreement, USC's payments to Dr. Baker, or

supposedly fraudulent prescriptions were intended to mislead the FDA or the ABOP.  It could

have elicited that testimony from Kyle Zorn or Rob Hopkins but it did not.  The only inference

that the jury could have possibly drawn from Hopkins' testimony about the consulting agreement

and Dr. Baker's invoices and payments was that *Hopkins* intended those documents to mislead

the SEC and Adamis's auditors.  There was no basis to infer that Sam intended to mislead the

FDA or the ABOP.

Moreover, the only evidence relating to a "paper trail" connected to Sam suggested that

he implemented a system to *identify* the Dr. Baker orders in USC's email records and

chargemaster, not to hide them.  Tr. at 138:5–18, 838:1-19.  There is no testimony or other

evidence that the purpose of this system was to hide the fact that Dr. Baker was not seeing horses

from the FDA or ABOP.  Rather, Zorn testified that the purpose of putting the rep's initials in the subject line of the emails was so that "accounting would know how to pay the reps properly." Tr. at 138:5-18.  And Hopkins confirmed that the purpose of separating the Dr. Baker trainer accounts in the chargemaster was to track the "amount owed to Dr. Baker."  Tr. at 838:2-19. Any conclusion by the jury that Sam intended to defraud the FDA or ABOP based on this evidence would have been based on impermissible speculation, not reasonable inference.

The government did nothing to cure the circularity of this first basis during its rebuttal summation.  Instead, it told the jury that if any of the agencies regulating USC "were to come in, do their on-site inspection, or serve a subpoena, ask for records, they would pull up prescription records that made it look like this drug was validly prescribed when it wasn't."  Tr. at 1668:2-14. But that *hypothetical* scenario is the definition of speculation.  The government then pointed the jury to evidence of materiality, rather than evidence proving the essential element of intent:

> If you're a pharmacy and you're running a fake prescription scheme, that is going to matter to the state agencies that license you.  And you heard John Kirtley testify that if he had known that there was some kind of kickback arrangement that was going on, well, that Arkansas Board of Pharmacy hearing would have been very different.  The questions would have been very different.  And make no mistake, those facts were not brought up.

Tr. at 1668:18-25.  The materiality of the alleged scheme—even as *de minimis* as it was—proves nothing about Sam Glover's intent.

Fittingly, the government's circular argument ended exactly where it started, urging the jury that Sam's intent to defraud was "baked into the very foundation of this false prescription scheme."  Tr. at 1669:1-5.  That is not evidence that supports a finding of guilt beyond a reasonable doubt.  It is a circular argument that improperly asks the jury to assume the very intent the government was required to prove.  *See Valle*, 807 F.3d at 533 (Straub, J. dissenting) ("This flawed analysis commits the fallacy of *petitio principii* (circular reasoning) because 'what

30

is to be proved is implicitly presumed as true in the premise.'") (citations omitted).  The government cannot take the defining element of a crime and tell the jury that it was "baked into" the alleged scheme.  It has to prove it beyond a reasonable doubt and it failed to do so.

### 2.    The government's second basis was similarly flawed

The government's second basis for finding an intent to defraud—that Sam knew it was wrong because the pharmacists told him so—fares no better.  Tr. at 1575:12-13.  This argument also conflates the knowing and willful membership element with the intent-to-defraud element.  The fact that the pharmacists told Sam it was wrong has nothing to do with the FDA or the ABOP, or any intent on Sam's part to defraud those regulators.  A finding that Sam knew what he was doing was wrong supports only a misdemeanor violation of the FDCA.  *Navarro*, 551 F. Supp. 3d at 391.  The felony conspiracy charged in this case requires more.  *Id*.

The government pointed to testimony from Rhonda Beck that she explained to Sam that "there had to be an annual exam performed by the physician in order to write the prescriptions," and testimony from Natasha Adkins that she told Sam that "I didn't feel like there was any possible way that he had an appropriate vet-client relationship, there was no physical way he was seeing all those horses, traveling [to] all those states, and I didn't think the prescription was legitimate."  Tr. at 1577:17-18, 1577:22-1578:1.  The government once again mischaracterized the evidence to convince the jury of Sam's intent: "And how does the defendant respond?  He doesn't deny it.  He doesn't say what are you talking about, of course he has a relationship with the horses, he's been scoping all of these horses."  Tr. at 1578:16-19; *see also* Tr. at 1655:1-11 (rebuttal summation).  As noted above, the government either forgot about Natasha Adkins' repeated and unequivocal testimony that Sam said exactly that, or it deliberately mischaracterized the evidence to the jury.  Either way, the government offered no basis other than speculation or surmise for the jury to bridge the gap between the separate element of

31

knowledge of wrongfulness, which is sufficient only for a misdemeanor conviction, and the specific intent to defraud required for a felony conspiracy charge.

The government also noted Sam's response to the pharmacists that they were going to put USC out of business, relying on the testimony of Natasha Adkins. Tr. at 1578:20-21. But Sam's desire to bring in revenue and to keep the pharmacy in business proves nothing about a specific intent to defraud the FDA or the ABOP. Nor is it sufficient to prove such intent beyond a reasonable doubt. Connecting Sam's goal to bring in revenue with an intent to defraud the FDA or ABOP constitutes, at most, impermissible speculation. *See Pauling*, 924 F.3d at 656. As the Second Circuit has cautioned, it does "not satisfy the [Constitution] to have a jury determine that the defendant is *probably* guilty." *Lorenzo*, 534 F.3d at 159 (internal quotation marks omitted). Speculation is not enough.

### 3. The government's allegation of a cover-up repeatedly mischaracterized the evidence and resorted to impermissible speculation

The government next argued that the jury knew Sam intended to defraud the FDA and the ABOP because of "the cover up." Tr. at 1580:208. On this point, the government repeatedly mischaracterized the evidence and again resorted to impermissible speculation.

*First*, the government argued that the consulting agreement was a "sham" and that it was introduced "after Glover wanted to do the illegal commission arrangement with Dr. Baker's wife." Tr. at 1580:22-24. To be clear, despite testifying pursuant to cooperation agreements, neither Zorn nor Hopkins testified that the consulting agreement with Dr. Baker was a sham. Only the government has ever used that term. But even if the government is correct that the agreement was intended to cover up the fact that USC was paying sales commissions to Dr. Baker, that provides no basis for the jury to infer that Sam therefore intended to mislead the FDA or the ABOP. In fact, Hopkins testified that he came up with the idea for the consulting

32

agreement with Dr. Baker because he did not want the "kickback" to be discovered by the SEC and Adamis's auditors—not the FDA or the ABOP. Tr. at 831:23-832:14; *see generally* 831:23-833:20. But the jury was never charged that the SEC or external auditors could be subjects of an intent to defraud under U.S.C. § 333(a)(2), and therefore, the Court may not affirm Sam's conviction on that basis. *See Chiarella v. United States*, 445 U.S. 222, 236 (1980) (a court "cannot affirm a criminal conviction on the basis of a theory not presented to the jury"); *see also McCormick v. United States*, 500 U.S. 257, 270 n.8 (1991) (courts "are not permitted to affirm convictions on any theory they please simply because the facts necessary to support the theory were presented to the jury"); *Ciminelli v. United States*, 598 U.S. 306, 316-17 (2023) (courts do not "cherry-pick facts presented to a jury charged on [one] theory and apply them to the elements of a different … theory in the first instance").

*Second*, the government argued that Sam, Rob Hopkins, and Kyle Zorn's communications over Signal were a cover-up because, "as Hopkins told you, they used that Signal app so that their messages were encrypted, could be deleted. They wanted to discuss their crime in secret now that they were getting caught." Tr. at 1583:9-14. But that argument is unsupported by the evidence. Hopkins never testified that the group decided to use Signal for any of those reasons. Hopkins testified that *he* wanted to use Signal "to make sure that our messages were not seen or shared or seen by anybody else," Tr. at 905:23-25. He never testified that he told that to Sam or that Sam ever suggested anything of the sort. The evidence showed that Hopkins invited his subordinates to use the Signal app, and they agreed. GX 702A. Neither Hopkins nor Zorn ever suggested that they used Signal to try to hide their communications from the FDA or the ABOP, nor was any nefarious purpose ever shared with Sam. Moreover, the

suggestion of possible deletion was misguided, as there was no evidence or testimony of deleted messages—text or Signal.

*Third*, the government argued that Sam worked with others to actively thwart the pharmacists' efforts to verify prescriptions. Tr. at 1584:21-22. That is not what the evidence showed, but even if it did, an intent to defraud the FDA or the ABOP does not follow. At most, an intent to mislead the pharmacists might follow, but that theory was not charged to the jury either, and thus is not a proper basis to uphold Sam's conviction. *See Chiarella*, 445 U.S. at 236; *McCormick*, 500 U.S. 257 at 270 n.8; *Ciminelli*, 598 U.S. at 316-17. Moreover, Rhonda Beck testified unequivocally that Sam never stopped the pharmacists from verifying prescriptions. Tr. at 1215:25-1216:2. Nor was there any evidence that Sam ever forced the pharmacists to approve prescriptions that they were not comfortable approving. Even as to Dr. Baker, Beck testified that after June 2020, the pharmacists continued to approve prescriptions that were either refills of previously verified orders or where they were able to independently verify the orders with Dr. Baker. Tr. at 1182:6-11. Adkins testified that eventually, the pharmacists stopped approving Dr. Baker orders because of the issues they experienced while attempting to verify them. Tr. at 646:5-9; *see also* GX 167, GX 173. Sam did not thwart anything the pharmacists were doing.

The government argued that Sam and Hopkins discussed trying to replace Rhonda Beck as the pharmacist-in-charge. Tr. at 1585:7-13. But Hopkins never testified that replacing Beck was part of some plot to defraud the FDA or the ABOP. Again, the government very easily could have tried to elicit such testimony from Hopkins, but it did not. The government also has no explanation as to why two conspirators trying desperately to cover up their criminal scheme would want to *retain* Beck as pharmacist-in-charge about one month later, as Hopkins testified. Tr. at 925:15-16. If, as the government argues, Beck had spent the last five months uncovering

this nefarious criminal scheme, it defies logic that Hopkins and Sam would then have wanted to keep her on as pharmacist-in-charge. The government's attempt to bootstrap Hopkins and Sam's alleged discussion about replacing Beck into a plot to defraud the FDA or ABOP fails. It is based on pure conjecture, not reasonable inference.

The government also argued that Sam implemented AZOVA to stop the pharmacists from verifying prescriptions and then participated in a scheme to misrepresent the AZOVA system to the ABOP. This is a mischaracterization of the evidence. Hopkins testified that he recalled a conversation with Sam about using the AZOVA system to stop the pharmacists from verifying prescriptions, but Adkins and Beck both confirmed that it was the pharmacists who proposed AZOVA as a solution to the verification issues they were experiencing. *Compare* Tr. at 912:25-913:19 *and* Tr. at 650:3-20, 1168:19-1169:11, GX 159 at 2.

As for the alleged scheme to misrepresent AZOVA at the August 6, 2020 hearing before the ABOP, the government introduced no evidence that Sam was responsible for the description of the AZOVA system by Reed Smith lawyer Rachael Pontikes at that hearing. Moreover, the only evidence of a misrepresentation to the ABOP has nothing to do with the Dr. Baker deal. Beck testified that she believed *she* was misrepresented because the Board was not told "that the pharmacists had to give the sales reps ***prescriptive authority***"—not that Dr. Baker was receiving commissions on prescriptions or that he was not seeing the horses for which he prescribed medication. Tr. at 1175:18-22 (emphasis added).

The only member of the ABOP to testify, Dr. Kirtley, never once stated that USC—let alone Sam Glover—defrauded the ABOP. Nor did he testify that the ABOP was somehow unaware of a requirement that the pharmacists had to give sales reps prescriptive authority, or that they needed Beck to clarify that for them at the hearing.

35

Recognizing the dearth of evidence that Sam intended to mislead the ABOP at the August 6 hearing, the government presented yet another bootstrapping argument to the jury: because Sam did not disclose to the ABOP that Dr. Baker was not seeing his patients or that USC was paying a percentage commission to Dr. Baker, Sam must have intended to defraud the ABOP. The government argued: "They [the ABOP] cared about kickbacks. They cared about whether the vet had a relationship with the animal. They cared about the details of the defendant's crime." Tr. at 1588:16-21. Of course, the ABOP meeting had nothing to do with any of those topics; it had to do with the AZOVA system. No evidence was presented at trial that Sam was ever told that the ABOP was concerned about kickbacks or VCPRs at the August 6 hearing. And the government introduced no evidence that Sam was responsible for the content of Rachael Pontikes's presentation to the Board. This kind of circular and conclusory argument is grounded in speculation and surmise, not evidence. It is an insufficient basis to convict a defendant of a felony conspiracy charge that requires proof of specific intent to defraud beyond a reasonable doubt.

Finally, the government argued that the jury could conclude that Sam acted with an intent to defraud because the crime continued after the ABOP hearing and the pharmacists' resignation. Tr. at 1588:22-1590:10. But the only evidence connecting Sam directly to any Dr. Baker orders after August 2020 was a single text message from January 2021 involving Sam, Kyle Zorn, and two individuals who have never been identified as co-conspirators—Clay Sutherland and Celeste Davis. *See* GX 212. Zorn testified that this order was for a trainer named John Kimmel, and that Dr. Baker was not the treating veterinarian for Kimmel's horses. Tr. at 314:16-315:4. But the government introduced no evidence that Zorn ever discussed that fact with Sam. Which is to say, there was no evidentiary basis for the jury to conclude that Sam understood this single order

for John Kimmel in January 2021 was an illegal prescription for a horse that Dr. Baker had not

seen, as opposed to a valid prescription based on a legitimate vet-client-patient relationship.  This

order, like the controlled delivery for which Sam had no knowledge or involvement whatsoever,

*see* Tr. at 1590:1-16 and GXs 1301-1341, provided no basis for the jury to infer that Sam acted

with an intent to defraud or mislead the FDA or ABOP.

> **4.    Neither Zorn nor Hopkins testified that the object of the conspiracy
> was to defraud the FDA or the Arkansas Board of Pharmacy**

The government next argued to the jury that "the fourth reason you know that the

defendant knew what he was doing was wrong and intended to mislead the regulators is because

the defendant's co-conspirators told you."  Tr. at 1590:22-24.  That is wrong.  Neither Zorn nor

Hopkins ever testified that they intended to mislead the FDA or the ABOP, or that it was the

object of the conspiracy to do so.  The government proceeded to explain all of the reasons why

the jury should believe Zorn and Hopkins, *see* Tr. at 1591:3-1592:14, but it failed to identify

testimony from either witness that it was the conspiracy's objective to defraud the FDA or the

ABOP.  That testimony simply does not exist.

> **5.    The government's final attempt to conflate and confuse the issues
> before the jury failed**

The government's final basis for supposedly proving Sam's intent to defraud reflected the

ultimate red herring in this case.  Time and time again, the government invited the jury to

conflate a sales-based commission to a veterinarian with knowledge of illegality, and then

knowledge of illegality with an intent to defraud.  But the conclusion does not flow from the

government's flawed premise.

The government told the jury that "the defendant knew what he was doing was wrong

because he knew the rules and he broke them anyway."  Tr. at 1592:15-16.  The government

repeated its interpretation of the Dr. Baker consulting agreement that has no connection to the

FDA or the ABOP and implored the jury to "use your common sense." Tr. at 1593:15-22. The government then argued that Sam knew from a draft corporate policy in 2018 that "the company is subject to federal and state laws and regulations and that such laws prohibit paying a doctor to prescribe." Tr. at 1593:23-1594:3; *see* GX 104. But that is wrong. Federal law does not prohibit a pharmacy from paying a sales commission to a veterinarian. And even if Arkansas state law prohibits illegal kickbacks, the government did not prove that Sam knew that sales commissions paid to a vet constituted a prohibited kickback. In fact, the draft policy that the government relied on during summation referred to "state anti-kickback" laws generally, and in the section focusing on Arkansas state law, the policy only made reference to laws prohibiting improper referral relationships in the context of "home medical equipment, legend device, and medical gas providers." GX 104 at 5. But even if this draft policy were enough to prove that Sam knew that Arkansas state law prohibited the payment of commissions to vets—and it is not—at most that would be proof of a knowing violation of Arkansas law. It is not proof of an intent to defraud anyone. *See Defendant(s)*, 2011 WL 13196436, at *5 (evidence that defendants understood they were deceiving their patients' families and violating California licensing law insufficient to prove intent to defraud Medi-Cal reimbursement program).

The government next referenced "all of the evidence you heard about that in 2020 time and time and time again he's told you cannot pay commissions." Tr. at 1594:8-10. Sam was never told in 2020 that USC could not pay commissions to vets. No such evidence exists. This was yet another egregious mischaracterization of the evidence by the government.

Finally, the government cited testimony that Sam attended company trainings, that he was present for the FDA inspection in 2015, and that "he knew from that FDA experience that the FDA had the power to shut the company down if it found something it didn't like." Tr. at

1594:11-20.  The government argued the FDA "is not some abstract agency that Glover has

never heard of" and that it was "part of the routine business of U.S. Compounding.  It's part of

Glover's work."  The government cited calendar entries for an August 2015 FDA recap, a

September 2015 conference call with FDA Dallas, and a January 2017 training on the *California*

Board of Pharmacy.  Tr. at 1594:24-1595:6.  The government told the jury that Sam "did not

need to know precisely what statute or regulation he violated" and that "it's not defense, none at

all, to say he didn't know which page of the rule book [that] said that."  Tr. at 1595:10-17.

   Sam's knowledge that the FDA existed, that it could shut down USC at any time, and

even Sam's alleged knowledge that what he was doing was wrong is beside the point.  None of

that has anything to do with whether Sam intended to defraud or mislead the FDA or the ABOP,

and whether the government proved such intent beyond a reasonable doubt.  The government

failed to do so.

   Nothing makes this clearer than Kyle Zorn's supposed conversation where he said that he

discussed the legality of the Dr. Baker deal with Sam.  Zorn testified that during this undated

conversation Sam said that "it wasn't that big a deal.  That the worst case [was] we would get a

slap on the wrist by the state board of pharmacy."  Zorn testified that he understood Sam to mean

that the worst-case scenario was that USC "would no longer be able to do the Dr. Baker deal."

Tr. at 145:23-146:16.  If believed, Sam's alleged words do not demonstrate an intent to defraud

or mislead the ABOP.  At most, the testimony supports a knowing violation of Arkansas state

law.  At most, it demonstrates a knowing misdemeanor violation of the FDCA, not the requisite

specific intent for felony conspiracy.  If Sam intended to and understood that he was criminally

defrauding the ABOP, the consequence would not have been a "slap on the wrist."  The Court

should reject the government's invitation to blur the distinction between a knowing misdemeanor

violation, a felony misbranding conspiracy, and the essential element of intent to defraud that differentiates the two.  *See Navarro*, 551 F. Supp. 3d at 391; *Mitcheltree*, 940 F.2d at 1351.

Finally, this case in no way resembles the felony FDCA prosecutions where the government was able to establish an intent to defraud.  The differences are stark.  *See e.g.*, *United States v. Purdue Frederick Co.*, No. 1:07-cr-00028 (W.D. Va. May 10, 2007), ECF No. 5 ¶¶ 19–20 (certain supervisors and employees at Purdue Frederick Company, Inc. fraudulently marketed OxyContin by falsely claiming that OxyContin was "less addictive, less subject to abuse, and less likely to cause tolerance and withdrawal symptoms than other pain medications" despite obtaining market research indicating that "the biggest negative of [OxyContin] was the abuse potential.");[2] *United States v. Hernandez*, No. 0:22-cr-60129-AHS-1 (S.D. Fla. June 15, 2023), ECF No. 92 at 35:2-8 (medications that the defendant sold contained the wrong medication, broken or glossy pills, and even pebbles); *United States v. Dailey*, No. 5:18-cr-20751-JEL-DRG (E.D. Mich. Jan. 8, 2019), ECF No. 11 at 3-5 (defendant purchased kratom—a powerful psychoactive substance that can produce opioid and simulant-like effects—from foreign suppliers in Indonesia and Malaysia; sold and shipped the kratom to consumers in plastic bags with the intent that consumers use it to treat and mitigate diseases such as opioid withdrawal and Lyme disease; and falsely marketed the kratom as "incense" on his website to avoid detection by the FDA).  These cases demonstrate clear evidence of criminal intent.  Sam Glover's case does not.

---

[2] Despite the egregiousness of these facts, only Purdue Frederick Company pled guilty to a felony.  The three corporate executives, including Vice President Michael Friedman, General Counsel Howard Udall, and Medical Director Paul Goldenheim, pled guilty to misdemeanors.

**CONCLUSION**

The government offered the jury an insufficient evidentiary basis to conclude that Sam acted with an intent to defraud or mislead the FDA or the ABOP.  It is no answer to say that a defendant is *probably* guilty.  The Constitution requires more, and in this case, the government came up short.  The defense respectfully requests that the Court grant Mr. Glover's Rule 29 motion and enter a judgment of acquittal.

Dated: New York, New York           Respectfully submitted,
      August 1, 2025

                                          /s/ Marc L. Mukasey
                                        Marc L. Mukasey
Torrey K. Young
Brianna Alford (admitted *pro hac vice*)
Michael F. Westfal

MUKASEY YOUNG LLP
570 Lexington Avenue, Suite 3500
New York, New York 10022
Tel: (212) 466-6400
Email: marc.mukasey@mukaseylaw.com

*Counsel for Sam Glover*