UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------X
                              :

UNITED STATES OF AMERICA,         :

                              :

                              :

       -against-                     :                 24-CR-370 (VSB)

                              :

                              :                **OPINION & ORDER**

SAM GLOVER,                       :

                              :

                 Defendant.          :

                              :

--------------------------------------------------------X

VERNON S. BRODERICK, United States District Judge:

On June 27, 2025, following a nine-day jury trial Defendant Sam Glover ("Defendant" or "Glover") was convicted of conspiracy to deliver and introduce for delivery into interstate commerce a misbranded and adulterated drug, in violation of 21 U.S.C. §§ 331(a) and 333(a)(2) and 18 U.S.C. § 371. Before me is Defendant's motion for a judgment of acquittal. Because I find that Glover has not met his burden to show that no rational trier of fact could have found him guilty beyond a reasonable doubt, Defendant's motion is DENIED.

## I.      **Background and Procedural History**

### A.    *The Indictment*

Glover worked at U.S. Compounding Inc., ("USC"), a drug compounding company, serving as the company's Vice President of Sales from "at least" 2015 until 2021. (Doc. 3 ("Indictment") ¶ 3.) Glover "oversaw the development of sales for [USC]'s veterinary and animal medications." (Doc. 32 at 2.) On July 9, 2024, the Indictment against Glover was unsealed. The Indictment contained one count, ("Count One"), charging that, from at least in or about 2015 through at least in or about 2021, Glover conspired and agreed with others to

introduce and deliver for introduction, into interstate commerce, an adulterated and misbranded[1]

drug with intent to defraud and mislead in violation of 21 U.S.C. §§ 331(a) and 333(a)(2).

(Indictment ¶¶ 1–7.)  The Indictment alleges that Glover conspired with a Kentucky-based

veterinarian by paying the veterinarian to prescribe a drug to horses that the veterinarian had not

seen.  (*Id*. ¶¶ 3–4.)  The Indictment further alleged that Glover "caused payments to be made to"

the Kentucky-based veterinarian in return for utilizing his credentials "to make it falsely appear

as if the drugs . . . had been validly prescribed by" the veterinarian.  (*Id*. ¶ 4.)  Glover was

arraigned on July 19, 2024, and was released on a $75,000 personal recognizance bond the same

day.  (*See* Docs. 11–14.)  On January 10, 2025, I set trial to begin on June 16, 2025.

### B.    *Trial*

Jury selection took place on June 16, 2025 and June 17, 2025.  During the afternoon of

June 17, 2025, the parties gave their opening statements and witness testimony began.  The jury

retired to deliberate on June 27, 2025, and returned a verdict later that day.  Glover's motion

asserts that the "government failed to introduce sufficient evidence to prove beyond a reasonable

doubt that Mr. Glover acted with the intent to defraud or mislead the Food and Drug

Administration ("FDA") or the Arkansas Board of Pharmacy ("ABOP")."  (Doc. 107 at 1.)

### 1.  The Government's Case

The Government called 15 witnesses at trial.  The Government established Glover's guilt

on Count One through, among other things:  (1) testimony of Kyle Zorn ("Zorn"), a cooperating

witness who worked at USC, and pled guilty to conspiring, with Glover and others, to distribute

---

[1] A drug is "adulterated" or "misbranded" within the meaning of these statutes if it requires a prescription and "is administered without a valid prescription, that is, not in the usual course of a veterinarian's professional practice, or not administered pursuant to any prescription at all."  (Indictment ¶ 2.)

misbranded and adulterated drugs from as early as 2011 to 2021, (Tr.[2] 116–18); (2) testimony of Robert Hopkins ("Hopkins"), a cooperating witness who was the Chief Financial Officer of USC's parent company, Adamis Pharmaceuticals ("Adamis"), and pled guilty to conspiring, with Glover and others, to distribute misbranded and adulterated drugs, and submitting false SEC filings, (*id*. at. 820–21); (3) testimony from Scott Tarter and Ignacio Patino, former USC clients who testified that Dr. William Baker ("Dr. Baker") was not their horses' veterinarian and had never treated their horses, (*id*. at 105–08, 545–48); (4) testimony from Dr. Robert Franklin, an equine veterinarian who participated in a study evaluating the effects or efficacy of omeprazole fenbendazole with USC, (*id*. at 804–05); (5) testimony from Natasha Adkins, a former pharmacist at USC, (*id*. at 552–53); (6) testimony from Rhonda Beck, a former pharmacist at USC, (*id*. at 1093–94); (7) testimony from Lindsay Richardson, a former pharmacist at USC, (*id*. at 1233); (8) testimony from Lloyd Payne, a consumer safety officer for the FDA who participated in an inspection of USC between August 10 and August 21, 2015, (*id*. at 474, 476–80); (9) testimony from Elizabeth Christie, a forensic accountant with the Federal Bureau of Investigation ("FBI"), who reviewed bank records and subpoena returns and prepared a document depicting payments to Dr. Baker from 2014 to 2020, (*id*. at 1013–14, 1054–60; *see also* GX 303); (10) testimony from Bruce Turpin, a special agent with the FBI, who interviewed Glover on May 3, 2021, (Tr. 1436–37); (11) testimony from Arjun Ahuja, a paralegal in the Office of the United States Attorney for the SDNY who during his testimony reviewed certain Government exhibits including a phone extraction, emails, and text messages, (*id*. at 1454); (12) the consulting agreement and emails evidencing the alleged "Dr. Baker deal" whereby USC sales representatives sold USC-compounded omeprazole fenbendazole directly to horse trainers and others using Dr. Baker's name as the prescribing

---

[2] "Tr." refers to Glover's trial transcript.

veterinarian even though he was not their horses' veterinarian in exchange for an alleged kickback, and Glover's awareness of payments owed to Dr. Baker, (GX 112, GX 114, GX 122–25; *see* Tr. 185–86 (Zorn testifying that Roger Attfield was a horse trainer and was part of the Dr. Baker deal); *see also* GX 128, GX 134, GX 136, GX 162, GX 165, GX 167, GX 172–73, GX 202C, GX 203A–B, GX 208D, GX 208E, GX 209, GX 701E, GX 704B, GX 704L, GX 704O, GX 704P, GX 1101); (13) emails on which Glover was copied, including some that approved sales of omeprazole fenbendazole which included Dr. Baker's name and sales representatives' initials in the subject line, (GX 122–25, GX 2501–11; *see also* Tr. 138 (Zorn's testimony that it was Glover's idea to "signify that [] an order [was] going under the Dr. Baker deal" by indicating Dr. Baker in parentheses, with the sales representative's initials in the subject line of an email)); (14) emails evidencing concerns by USC pharmacists regarding verifying orders of prescription medications, including omeprazole fenbendazole, (GX 158, GX 162, GX 165, GX 167, GX 172–73, GX 214S, GX 703C, GX 1603); and (15) emails evidencing the discussions and implementation of the Azova electronic prescription system, including Glover's involvement in that process, (GX 184–85, GX 201B, GX 202B, GX 216C, GX 1401–03, GX 1405–08).

Zorn, a former USC employee and a cooperating witness, gave detailed testimony about the Dr. Baker deal. (*See* Tr. 117–18, 134–40, 165, 182–83, 216, 277.) Zorn testified that he, Glover, and others, conspired to misbrand drugs by selling omeprazole fenbendazole "without a direct client-patient relationship with veterinarians that were not seeing the horses and establishing those relationships." (*Id*. at 118.) Zorn stated that Dr. Barker was not providing any consulting services under the consulting agreement he had with USC and then with Adamis after Adamis acquired USC. (*See id*. at 157–58; *see also* GX 109 (the "US Compounding Independent Contractor (IC) Agreement" between Dr. Baker's wife and USC dated July 18, 2016), GX 117

4

("Consulting Services Agreement" between Dr. Baker and Adamis dated October 4, 2016), GX 128 ("Consulting Services Agreement" between Dr. Baker and Adamis dated October 25, 2017).) Zorn testified that Dr. Barker was paid monthly "based on the dollar amount of products that [USC] sold that had his name attached to the prescriptions," (Tr. 163), "without Dr. Barker seeing those clients," (*id.* at 137). Zorn also testified about Glover's involvement in discussions regarding payments to Dr. Baker. (*Id.* at 136, 214–16, 221–222, 280, 307; *see also* GX 112, GX 114, GX 122–25, GX 134, GX 136, GX 202C, GX 203A–B, GX 208D, GX 208E, GX 209, GX 701E, GX 704B, GX 704L, GX 704O, GX 704P, GX 1101.) Zorn estimated that "less than 10 percent" of omeprazole fenbendazole prescriptions that he sold under the Baker deal involved an endoscope (also referred to as a "scope") on horses and that for the "majority" of the remaining 90% of omeprazole fenbendazole prescriptions sold without a scope there was no relationship between Dr. Barker and the horse receiving the prescription. (Tr. 165.)

Zorn further testified concerning the details of Glover's involvement in the Dr. Baker deal. Zorn testified that it was Glover's idea to "signify that [] an order [was] going under the Dr. Baker deal" by indicating Dr. Baker in parentheses, with the sales representative's initials. (Tr. 137–38; *see also id.* at 280.) Zorn also testified that Glover was present during "some" of his sales pitches during which he would tell clients that "if their vet didn't prescribe [USC's omeprazole fenbendazole], [they] could do it in house," i.e., at USC using the Dr. Baker deal. (*Id.* at 140–41; *see also id.* at 182, 277.) Zorn testified that, at some point, he asked Glover about the legality of the Dr. Baker deal and Glover told him: "That it wasn't that big a deal. That the worst case would [be] we would get a slap on the wrist by the state board of pharmacy," which Zorn understood to mean "[t]hat [they] would no longer be able to do the Dr. Baker deal." (*Id.* at 145–46.) Zorn also testified that he raised concerns with Glover from USC pharmacists regarding "prescriptions that

5

were being run under Dr. Baker's name and the number of states that they were shipping to." (*Id.* at 299.)

Zorn was cross-examined about, among other things: (1) the benefits he hoped to receive as a result of his cooperation with the Government and his testimony, (Tr. 447); (2) commissions he received as a result of the Dr. Baker deal, (*id.* at 440–44); and (3) observing horses with Dr. Baker and Glover, including sitting in on some of Dr. Baker's surgeries, (*id.* at 359), and scoping horses together, (*id.* at 380–86, 393–95, 402, 405–09, 419; *see also* DX 846, DX 847, DX 849).

Hopkins, the former Chief Financial Officer of Adamis and a cooperating witness, testified in detail about his communications with Glover regarding the Dr. Baker deal, including explaining to Glover that the original agreement USC had with Dr. Baker, (*see* GX 109, GX 117), was "an illegal kickback to a doctor," (Tr. 832). After being "ask[ed] . . . to come up with a solution to pay Dr. Baker" because he "was extremely important to the vet business," Hopkins "came up with a consulting agreement idea" and discussed it with, among others, Glover. (*Id.* at 833.) Hopkins recalled a conversation with Glover where Glover explained that USC wanted to continue paying Dr. Baker and the mechanics of paying Dr. Baker. (*Id.* at 835–44.) Hopkins also recalled speaking with Glover in 2016 when he "affirmed" that "Dr. Baker was not going to see the horses." (*Id.* at 843; *see also id.* at 844–50.) When Hopkins asked Glover how the prescriptions listing Dr. Baker as the prescribing veterinarian would be approved without a physician-patient relationship, Glover "responded . . . don't worry about it, dad will push it through and approve it." (*Id.* at 844; *see also id.* at 846.) Hopkins also testified that he spoke to Glover several times throughout 2020 about concerns from USC pharmacists that USC was shipping medications to states where Dr. Baker was not licensed and that there was no physician-patient relationship, and they discussed the fact that USC pharmacists began verifying orders through Dr. Baker and horse owners. (*Id.* at 882–

91, 905–906, 930–35.)  Glover suggested to Hopkins that they ask Rebecca Mitchell ("Mitchell"), a USC consultant, to replace the then-current pharmacist in charge, but Hopkins questioned whether Mitchell could "keep a secret," *i.e.*, be trusted to conceal "that the Dr. Baker deal was going to continue."  (*Id*. at 910–11; *see also* GX 202D.)  Hopkins recalled that after terminating the consulting agreement with Dr. Baker, Zorn and Glover called him "to communicate that they'd figured out a way to continue the Baker deal."  (Tr. 928.)

Hopkins also testified that he spoke with Glover about preparing for the meeting with the ABOP regarding securing authority to use the Azova electronic prescription system.  (Tr. 912–15, 922.)  Hopkins testified that Glover believed that Azova "would be a solution" because it would "eliminate the need for pharmacists to verify" prescriptions with veterinarians.  (*Id*. at 912–13.)  According to Hopkins, Glover told him that Zorn "would continue to act as Dr. Baker and have his password login and actually approve the encrypted messages back to the pharmacy, so we bypass Dr. Baker entirely."  (*Id*. at 913.)  Hopkins and Glover also discussed how to respond to Johnson when she asked questions about Azova.  (*Id*. at 914–15.)  Hopkins and Glover also met "between June and the end of July" 2020 to prepare for USC's meeting with the ABOP.  (*Id*. at 915, 922.)  The Government introduced Mitchell's time records from July 2020 which included the following entry on July 6, 2020:  "Regulatory discussion with Sam RE requesting a formal conference with Arkansas Board of Pharmacy to discuss Azova."  (*Id*. at 921–22; *see also* GX 185, GX 216C (July 27, 2020 calendar entry for "Phone Conference - USC - Azova System" listing Glover, USC's then Vice President of Finance, and USC's counsel as attendees).)  According to testimony from John Kirtley, the executive director of the Arkansas State Board of Pharmacy, USC's counsel informed the ABOP that veterinarians would provide information to USC's sales representatives, who would then "take down whatever the

veterinarian was saying and put it back into the veterinarian side of the Azova system . . . and then the veterinarian would . . . at some later point . . . approve that order and [] submit [it] to the pharmacy as a prescription." (Tr. 748–49.)  Hopkins explained that USC's counsel "told the Arkansas Board of Pharmacy that we needed [] Azova to streamline and improve the operations and the flow within the pharmacy" but did not mention the Dr. Baker deal or the USC pharmacists raising issues with verifying orders. (*Id*. at 923–24; *see also id*. at 759–61.)  On the day that USC received a provisional six-month approval to use Azova, Hopkins texted Glover, "Rhonda [Beck] lost today," (GX 202B), referring to USC's then-pharmacist in charge who did not want USC to use Azova. (*See* Tr. 924–25.)  Glover responded:  "Excellent.  Now I can move forward the right way." (GX 202B.)

Hopkins was cross-examined about, among other things:  (1) the benefits he hoped to receive as a result of his cooperation with the Government and his testimony, (Tr. 993–95, 998–99); (2) his origination of the consulting agreement with Dr. Baker, his understanding that veterinarians be paid using consulting agreements, his belief in the fall of 2016 that Dr. Baker would talk positively about products at the time at racetracks or horse races, barns, etc., (*id*. at 966–68, 977); and (3) his approval of Dr. Baker's invoices, (*id*. at 981–82).

The Government called three witnesses from the FBI.  First, Special Agent Giarrusso testified regarding the chain of custody for tubes of omeprazole fenbendazole paste, listing Dr. Baker as the prescribing veterinarian and shipped to "Bruce King" in New York, which were seized by Special Agent Turpin. (Tr. 455–61; *see also* GX 1301–17, GX 1329–38, GX 1340–41.)  Zorn testified that he assisted the FBI in placing an undercover order using the Azova electronic prescription system as part of the Dr. Baker deal. (Tr. 317–23.)  Defense counsel did not cross-examine Special Agent Giarrusso. (*Id*. at 461.)  Second, forensic accountant Christie testified

about her review of bank records and documents produced in response to subpoenas and summarized the payments provided to Dr. Baker. (Tr. 1013–19, 1054–60; *see also* GX 303.) According to Christie's analysis, USC paid Dr. Baker $457,754 from 2015 to 2020. (GX 303.) Christie was then subjected to a brief cross-examination about the documents reviewed and not reviewed as part of her analysis. (Tr. 1086–91.) Third, Special Agent Turpin testified about his interview of Glover, and that when he stated to Glover that not all of Dr. Baker's patients were examined by Dr. Baker that Glover "acknowledged" that "and said yeah." (*Id.* at 1437–38, 1445.) Special Agent Turpin was then subject to a brief cross-examination about Glover's cooperation during his interview with Turpin. (*Id.* at 1447–49.)

The Government also called three former USC pharmacists—Beck, Adkins, and Richardson—as witnesses, all of whom testified regarding Glover's resistance to the pharmacists' efforts to verify emailed prescriptions, including Dr. Baker prescriptions. Beck, Adkins, and Richardson also testified that they confronted Glover several times about the issues they encountered while attempting to verify prescriptions under Dr. Baker's name. (Tr. 562–68, 583–87, 596–98, 605–06, 612–13, 617–21, 1146–47, 1149–59, 1165–71, 1178–79, 1251–53.)[3] Beck, USC's pharmacist in charge, testified that she began raising concerns in early 2020 about USC sales representatives emailing orders for prescription drugs to Glover in "multiple" discussions, including "[e]-mail and in person and in leadership meetings." (Tr. 1146–50.) Beck testified that she told Glover in a March 9, 2020 meeting that the "e-mailed prescriptions were not legal" and

---

[3] Adkins testified that she raised concerns about Dr. Baker to Glover in approximately "five meetings in person and at least that many email communications" from March to September 2020, when she resigned. (Tr. 563.) Beck testified that she raised concerns about Dr. Baker to Glover "[p]robably eight to ten" times in person between April and June 2020. (*Id.* at 1156.) Beck also resigned in August 2020, the day after the ABOP hearing. (*Id.* at 1226.) Richardson also shared her "shock[]" with Glover regarding "how [Dr. Baker] could have a relationship with that many [horses] in that many states." (*Id.* at 1246–47, 1252–53.) Richardson resigned after the August 13, 2020 meeting. (*Id.* at 1254.)

9

were "not valid prescriptions," and Glover's response was "that he would direct . . . the sales reps that the e-mails had to be validated." (Tr. 1149–50.) Beck testified about her March 18, 2020 email to Glover, USC's Director of Equine Sales, and USC's pharmacists, in which she explained that "for a prescription to be considered legal, there must be a doctor, patient and pharmacist relationship" and that "[e]-mail . . . [and] [c]alling a sales representative is not a legal form of prescribing." (GX 158 (Beck directing pharmacists to "contact the doctor in order to verify the information received" to "make the prescription legal"); *see also* Tr. 1151–56.) Beck, Adkins, and Richardson all testified regarding issues that arose when they attempted to verify prescriptions during which they learned that the owner or employees of the barns did not know of Dr. Baker. (Tr. 583–88, 595–606, 612–14, 1146–47, 1151–59, 1164–71, 1178–79, 1245–51; *see also* GX 158, GX 162, GX 167, GX 172–73, GX 703C, GX 1603.)

When Glover was confronted by the USC pharmacists regarding the legality of the Dr. Baker deal, he pushed back, stated that he would continue with the Dr. Baker deal with or without them, and expressed concern about potential loss of business without continuing the Dr. Baker deal. Beck also testified that Glover expressed "concern of potential loss of business due to the time it would take the pharmacist to validate [] prescriptions" in a March 9, 2020 meeting. (Tr. 1150.) Adkins testified that shortly after a May 29, 2020 email from Johnson to Glover and others, requesting an "explanation of the Dr[.] Baker Deal," (GX 162), the USC pharmacists met with Glover where she "told [Glover]. . . that [she] knew that there was no consulting agreement for him to work on scopes, that that was a lie. That [the USC pharmacists] knew that Dr. Baker was being paid so that the sales reps could send in orders and put his name on them, Dr. Baker's name on them, to pass them off as if they were prescriptions. And that [the USC pharmacists] would no longer being filling Dr. Baker prescriptions." (Tr. 646.) Glover's response was that the USC

10

pharmacists "were going to put them out of business" because "Dr. Baker brought in millions of dollars a year." (*Id.*)  At an August 13, 2020 meeting described by Beck, Adkins, and Richardson, Glover said that he would continue the Dr. Baker deal with or without the pharmacists and gave them an ultimatum: to either continue filling Dr. Baker prescriptions despite their verification concerns, or quit USC.  (Tr. 658–60 (Adkins testifying that Glover stated "he would do this with or without us"), 1173–79 (Beck testifying that Glover stated "it was going to happen this way, and if the pharmacists did not like that, they can find another job"), 1251–54 (Richardson testifying that Glover stated "if we weren't comfortable with it, then we should leave").)

Adkins, Beck, and Richardson were cross-examined about, among other things, it being their responsibility as dispensing pharmacists to verify prescriber licenses.  (*Id*. at 688, 1207–08, 1257–58.)  Beck was also cross-examined about her raising concerns to Glover regarding Dr. Baker but never observing him as a practicing physician, reviewing his clinic's records, or visiting his office, the whistleblower complaint filed with the Securities and Exchange Commission on her behalf which notes that the whistleblower client is seeking an award, and reaching a non-prosecution agreement with the United States Attorney's Office whereby she would not be prosecuted for her participation in processing orders of an invalidly prescribed drug if she tells the truth.  (*Id*. at 1223–24, 1228–29.)

### 2.   The Defense's Case

The Defense did not call any witnesses.  At the conclusion of the Government's case, Glover moved for a judgment of acquittal pursuant to Rule 29 arguing that the evidence with regard to knowledge and intent was insufficient to sustain conviction on Count One and the Government's "failure to establish by a preponderance of the evidence that any co-conspirator committed an act in furtherance of the conspiracy in the Southern District of New York that was reasonably foreseeable to Mr. Glover."  (Tr. 1470.)  I denied the motion, stating: "there is more

11

than sufficient [evidence] to allow the case to go to the jury." (*Id*. at 1474.) I then mentioned the testimony by two cooperating witnesses who testified about their involvement and the corroborative evidence of the USC pharmacists who indicated that they raised concerns, "all [of which] goes towards Mr. Glover's state of mind at the time." (*Id*. at 1473–74.) With regard to the issue of venue, I noted that Scott Tarter, an owner and operator of two horse farms in New York, testified about receiving omeprazole fenbendazole from USC in the Southern District of New York. (*Id*. at 1474; *see also id*. at 106–07 (Tarter testifying that USC shipped omeprazole fenbendazole "[e]ither to Riverdale [in the Bronx] or to Twin Lakes" in Westchester County).)

### 3.  The Verdict

After summations on June 26, 2025, the jury began deliberations. During its deliberations, after sending seven notes, only one of which related to the evidence presented during trial, the jury convicted Glover on Count One on June 27, 2025. (Tr. 1681–83; *see also* Doc. 81 ("Jury Verdict Form").) With respect to Count One, the jury found that the Government had proven beyond a reasonable doubt the charge of conspiracy to distribute adulterated or misbranded prescription drugs with intent to defraud or mislead. (Jury Verdict Form 1.)

### C.    *Post-Trial Briefing*

On August 1, 2025, Glover filed a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29, (Doc 106), and an accompanying memorandum of law in support of his motion for a judgment of acquittal, (Doc. 107 ("Mem.")). The Government filed its opposition to Glover's motion on September 5, 2025, (Doc. 108). On September 19, 2025, Glover filed a reply brief in further support of his motion, (Doc. 111 ("Reply Mem.")).

On September 23, 2025, I issued an Order directing the parties to file letter briefs regarding the impact, if any, the Second Circuit's decision in *United States v. Fishman*, 157 F.4th 143 (2d Cir. 2025), has on the pending motion for a judgment of acquittal. (Doc. 112.) On

12

October 3, 2025, the parties filed their letter briefs in response to my Order.  (Docs. 113, 114.)

**II.      Legal Standard**

Federal Rule of Criminal Procedure 29(c)(2) provides, in part, that "[i]f the jury has returned a guilty verdict, the court may set aside the verdict and enter an acquittal."  A district court may enter a judgment of acquittal under Rule 29 "only if, after viewing the evidence in the light most favorable to the prosecution and drawing all reasonable inferences in the government's favor, it concludes no rational trier of fact could have found the defendant guilty beyond a reasonable doubt."  *United States v. Reyes*, 302 F.3d 48, 52 (2d Cir. 2002) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)).  In other words, the "evidence that the defendant committed the crime alleged [must be] nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt" for a court to acquit.  *United States v. Guadagna*, 183 F.3d 122, 130 (2d Cir. 1999) (internal quotation marks omitted).  When making this determination, a court cannot usurp the role of the jury or "substitute its own determination of . . . the weight of the evidence and the reasonable inferences to be drawn for that of the jury."  *Id.* at 129 (quoting *United States v. Mariani*, 725 F.2d 862, 865 (2d Cir. 1984)).  The court must "consider the evidence in its totality, not in isolation, and the government need not negate every theory of innocence."  *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000) (citation omitted).  If "the court concludes that either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [the court] must let the jury decide the matter."  *Guadagna*, 183 F.3d at 129 (alteration in original) (internal quotation marks omitted).  A defendant faces a "heavy burden" in meeting this standard.  *United States v. Bullock*, 550 F.3d 247, 251 (2d Cir. 2008); *see United States v. Tillem*, 906 F.2d 814, 821 (2d Cir. 1990) (noting that motions to challenge sufficiency of evidence "rarely carry the day").

## III.   Discussion

Glover seeks a judgment of acquittal, claiming that the evidence related to his intent to defraud was insufficient to sustain a conviction.  Because there is more than ample evidence in the record of Glover's intent to defraud, Glover's motion for a judgment of acquittal is DENIED.

### A.  *Applicable Law*

The elements of a conspiracy under 18 U.S.C. § 371 are:  "(1) an agreement between two or more persons to commit an unlawful act; (2) knowingly engaging in the conspiracy intending to commit those offenses that were the objects of the conspiracy; and (3) commission of an 'overt act' by one or more members of the conspiracy in furtherance of the conspiracy."  *Reyes*, 302 F.3d at 53.  The Indictment alleged that violations of 21 U.S.C. §§ 331(a) and 333(a)(2) are the substantive offenses underlying the § 371 conspiracy charge.  (Indictment ¶¶ 5–6.)  Under 21 U.S.C. §§ 331(a) and 333(a)(2), it is illegal to "introduc[e] or deliver[ ] for introduction into interstate commerce . . . any drug . . . that is adulterated or misbranded" "with the intent to defraud or mislead."  A drug is misbranded "[i]f its labeling is false or misleading in any particular."  21 U.S.C. § 352(a)(1).  The Indictment further provides that a drug is "adulterated" or "misbranded" within the meaning of these statutes if it requires a prescription and "is administered without a valid prescription, that is, not in the usual course of a veterinarian's professional practice, or not administered pursuant to any prescription at all."  (Indictment ¶ 2.)

In charging the jury at the end of the case, I explained that the Government was required to prove that Glover acted with intent to defraud or mislead:

> To act with ["]intent to defraud["] means to act with specific intent to deceive or cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself.  The intent must be connected, related in time, causation or logic to the commission of the misbranding or adulteration offense that is the subject of the charged conspiracy.

14

> It is not necessary, however, for the government to prove that anyone was, in fact, defrauded, as long as it proves beyond a reasonable doubt that the defendant acted with the intent to defraud.
>
> To act with "intent to mislead" means to act with specific intent to create a false impression by misstating, omitting, or conceding material fact -- concealing material facts. It is not necessary, however, to prove that anyone was in fact, mislead, as long as it is established beyond a reasonable doubt that the defendant acted with the intent to mislead.
>
> Intent need not be proved directly. You may infer the defendant's intent from the surrounding circumstances. You may consider any statement made or omitted by the defendant, and all other facts and circumstances in evidence which indicate state of mind.
>
> . . .
>
> "Intent to defraud or mislead" can be demonstrated by evidence of intent to defraud or mislead consumers, state drug regulators, and the FDA.
>
> In addition, the government need not prove that the intent to defraud or the intent to mislead was the only intent of the defendant. A defendant may have the required intent even if the defendant was motivated by other lawful purposes as well.

Tr. 1519–20. The court in *United States v. Fishman* confirmed that this jury instruction reflects "[w]hat matters" under 21 U.S.C. § 333(a)(2), which "is that the intent to mislead is *connected* to the misbranding or adulteration." 157 F.4th at 154 (emphasis in original); *id.* (approving the court's jury instructions at trial: "To act 'with intent to defraud' means to act with the specific intent to deceive or to cheat, ordinarily for the purpose of either causing some financial loss to another or bringing about some financial gain to oneself. The intent must be connected—related in time, causation or logic—to the commission of the misbranding or adulteration offense that is the subject of each charged conspiracy. . . . To act with 'intent to mislead,' means to act with a specific intent to create a false impression by misstating, omitting or concealing material facts. . . . Intent to defraud or mislead can be demonstrated by evidence of intent to defraud or mislead consumers, state racing and drug regulators, the Food and Drug Administration, or other federal

drug enforcement authorities.").

### B. *Application*

As I found during trial, the evidence presented by the Government, viewed in the light most favorable to the Government, supports a finding of Defendant's guilt on Count One. Glover argues that the Government presented insufficient evidence that he intended to deceive either the FDA or ABOP, (Mem. 24–40; *see generally* Reply Mem.), and that *Fishman* confirms that proof of directly misleading a regulator is necessary to sustain a conviction, (*see* Doc. 114 at 4 ("The court in *Fishman* analyzed whether there was sufficient evidence in the record connecting state racing regulators to the underlying misbranding violations to support a jury instruction that state racing regulators could be a target of [the defendant's] intent to defraud."); *id*. at 5 ("Both the target of the intent to defraud and the evidence proving that intent must be connected to the misbranding violation at issue under *Fishman*.")).  Glover argues that the evidence the Government presented at trial falls short of the standard set forth in *Fishman* because "the bulk of the evidence . . . does not relate to the FDA, ABOP, or the misbranding violation."  (*Id*. at 4–5.)  As an initial matter, I reject Glover's expansive reading of *Fishman*, just as the *Fishman* Court rejected a similar argument by the defendants there, *see Fishman*, 157 F.4th at 156 ("[W]e do not agree with Defendants that the statute reaches only fraudulent or misleading conduct directed at certain targets.  What matters under this statute is not the *identity* of the target of a defendant's intent to defraud or deceive." (emphasis in original)), and find that there is ample evidence in the record supporting the jury's verdict as to Count One.

In *Fishman*, the defendants, a veterinarian and his salesperson, were charged with and convicted of conspiracy to manufacture and distribute a misbranded equine drug in violation of 21 U.S.C. §§ 331, 333(a)(2)— the exact statute under which Glover was charged and convicted.

*See Fishman*, 157 F.4th at 151; *see also* Indictment ¶¶ 5–6; Jury Verdict Form.  The defendants

there "developed and manufactured unapproved performance enhancing drugs . . . that could not

be detected in a drug test, and [] sold them to horse trainers." *Fishman*, 157 F.4th at 150–51.  On

a motion for acquittal, the defendants "challenge[d] the government's theory that 'the intent to

defraud or mislead' element of 21 U.S.C. § 333(a)(2) can be satisfied if their intent was to

defraud state horse racing regulators" because they alleged that "the [Food, Drug, and Cosmetics

Act] regulates conduct directed at consumers, purchasers, or the FDA—not conduct under the

purview of state horseracing regulators who regulate the rules of racing." *Id*. at 151, 154.  The

Second Circuit rejected this argument and held that "§ 333(a)(2) does not limit the target of the

requisite intent to mislead to any particular categories of victims.  Instead, the essential

requirement of the statute is that the intent to mislead relate to the underlying 21 U.S.C. § 331

violation." *Id*. at 151.  In fact, the Second Circuit made clear that what matters under 21 U.S.C.

§ 333(a)(2) is that the intent to mislead is connected to the misbranding or the adulteration,

irrespective of which particular victim the defendant intended to defraud:

> "[W]e do not agree with Defendants that the statute reaches only fraudulent or misleading conduct directed at certain targets.  What matters under this statute is not the *identity* of the target of a defendant's intent to defraud or deceive.  What matters is the connection between the fraudulent intent and the offense of adulteration and misbranding:  Was the misbranding undertaken with the intent to deceive?
>
> …
>
> [T]he central question in the context of adulterating or misbranding drugs with an intent to defraud a government agency is not 'What is the agency?'  Rather, it's "[Is there] proof of an intent to mislead or defraud *which is connected to the misbranding violation under § 331[?]*'"

*Id*. at 156, 157–58 (citing *United States v. Mitcheltree*, 940 F.2d 1329, 1349 (10th Cir. 1991)

(emphasis and brackets in original)).  Thus, a defendant's affirmative efforts to conceal his

misbranding can serve as evidence of intent to defraud under 21 U.S.C. § 333(a)(2), even if the defendant's deceptive efforts were not explicitly directed towards the regulator. *See id.* at 154 (requiring that "the intent to mislead is *connected* to the misbranding or adulteration" (emphasis in original)). Dicta in *Fishman* further supports that the nature of the misbranding can itself be evidence of a defendant's intent to defraud or mislead. *Id.* at 157, n.4 ("[W]here a defendant *affirmatively* misbrands a drug (*e.g.*, labels it as something it is not), an inference could reasonably be drawn that they are doing so to avoid detection by or deceive a particular person or agency." (emphasis in original)).

Here, "Glover's scheme involved just such affirmative conduct: affixing false prescription labels to drugs and generating false records making it appear that Dr. Baker was prescribing the drugs that were shipped to consumers." (Doc. 113 at 2.) Glover's argument that the Government's evidence that he "generally knew that USC was regulated by the FDA and ABOP coupled with the deceptive nature of the scheme" is insufficient to prove intent to defraud, (Mem. 7), is an incomplete representation of the evidence presented at trial.[4] Instead, the conduct shown through the evidence presented at trial meets the standard articulated in *Fishman* and demonstrates Glover's intent to defraud. Glover repeatedly made

---

[4] Glover's attempt to distinguish the facts in his case from the facts in *Fishman* are similarly unpersuasive. Glover points to the fact that the defendants in *Fishman* "pocketed millions of dollars," "vett[ed] new clients to ensure they could be trusted," and designed the drug so that it "could not be detected on drug tests." (Doc. 114 at 4.) Moreover, Glover contends that "unlike the ulcer medications at issue here," the drug in *Fishman* "could cause a horse pain if administered incorrectly." (*Id.*) While Glover asserts that all of these facts were "clear evidence of criminal intent," (*id.*), these are distinctions without a difference. The Dr. Baker deal allowed USC to grow sales of omeprazole fenbendazole, Zorn testified that Glover would sometimes accompany him on client meetings where they would say that USC has a "consulting vet" and that if the client's veterinarian did not prescribe omeprazole fenbendazole, they "could do it in house," *i.e.* at USC using the Dr. Baker deal, (Tr. 140), Glover discussed replacing USC's pharmacist in charge with someone who could "keep a secret," *i.e.*, be trusted to conceal "that the Dr. Baker deal was going to continue," (*id.* at 910–11), and the purpose of the Dr. Baker deal was to create the appearance of legitimate prescriptions where there was no physician-patient relationship. Moreover, it is not unimaginable that a horse could have been injured by the administration of omeprazole fenbendazole that was prescribed by a doctor who had not scoped the horse.

misrepresentations calculated to ensure that the USC pharmacists, customers, and regulators had no knowledge of the Dr. Baker deal and to make certain that USC could continue to fulfill omeprazole fenbendazole prescriptions using Dr. Baker's name even though he did not have a physician-patient relationship related to those prescriptions.  Glover's involvement in the origination, renewal, continuation, and oversight of the Dr. Baker deal, along with his attempts to conceal the true nature of the Dr. Baker deal, and his knowledge of the FDA's and ABOP's regulation of prescription drugs "clearly threatened the protection of the public and flout[ed] the regulatory authority of the FDA and other governmental entities charged with regulating the use of drugs in animals." *United States v. Navarro*, 551 F. Supp. 3d 380, 398 (S.D.N.Y. 2021).

Numerous emails to and from Glover indicated his knowledge of and participation in the Dr. Baker deal and his intent to hide the nature and purpose of the Dr. Baker deal.  Zorn testified that in 2013 or 2014, he and Glover entered into an agreement with Dr. Baker to use his name on omeprazole fenbendazole prescriptions without Dr. Baker having an established physician-patient relationship.  (Tr. 133–34, 137.)  Glover was also involved in renewing the consulting agreement in 2017.  (*See* GX 202C (Glover texting Hopkins that he would follow up with Dr. Baker that day regarding the revised agreement); GX 128 (Glover emailing Hopkins the new Dr. Baker consulting agreement dated October 25, 2017).)  Hopkins testified that the consulting agreement was "a way to hide and mask what the true payment was for," in other words, to conceal that USC was paying Dr. Baker for using his name as a prescribing doctor for patients with which he did not have a relationship.  (Tr. 835; *see also id.* at 858 (explaining the consulting agreement with Dr. Baker "was meant to cover up what was actually happening and paying Dr. Baker for prescriptions that he allowed us to use his license for. . . . Because this consulting agreement could sit on the books and records of Adamis and U.S. Compounding and not be

flagged as an illegal agreement.").)  Hopkins also testified that he spoke with Glover about preparing for the meeting with the ABOP regarding securing approval to use the Azova electronic prescription system and that Glover believed that Azova "would be a solution" to the pharmacists' persistent questions, and would allow U.S. Compounding to avoid regulatory detection because it would "eliminate the need for pharmacists to verify" prescriptions with veterinarians, and allow them to continue to coverup the Dr. Baker deal.  (*Id*. at 912–15.) Moreover, Glover suggested to Hopkins that they ask Mitchell, a USC consultant, to replace the then-current pharmacist in charge, which Hopkins testified was Glover's suggestion to "use her to be the [pharmacist in charge] that wouldn't care if Dr. Baker wasn't seeing the horses or not and would allow [them] to continue working the Baker deal," but Hopkins questioned whether Mitchell could "keep a secret," *i.e.*, be trusted to conceal "that the Dr. Baker deal was going to continue."  (*Id*. at 910–11; GX 202D.)  As Hopkins testified: "we didn't want anybody to know that we were using Dr. Baker's license to send prescriptions to horses that he wasn't seeing and paying a commission on top of it."  (Tr. 911.)

The witness testimony and documents, including emails, introduced at trial were sufficient to show that Glover intended to mislead the FDA and ABOP in relation to the misbranding of omeprazole fenbendazole.  As an initial matter, Glover was aware that the Dr. Baker deal needed to be hidden from regulators.  When Zorn asked Glover about the legality of the Dr. Baker deal, Glover responded:  "That it wasn't that big a deal.  That the worst case would [be] we would get a slap on the wrist by the state board of pharmacy."  (Tr. at 145–46.)  Glover was involved in concealing from the ABOP the true reason for Adamis's desire to use Azova. (GX 184–85, GX 201B, GX 202B, GX 216C, GX 1401–03, GX 1405–08; Tr. at 912–15, 922–24, 759–61.)  Emails showed that Glover was involved in discussion regarding payments to Dr.

Baker for his participation in the Dr. Baker deal. (GX 114, GX 134, GX 136, GX 202C, GX 203A–B, GX 208D, GX 208E, GX 209, GX 701E, GX 704B, GX 704L, GX 704O, GX 704P, GX 1101.) Zorn testified that it was Glover's idea to create a coding system which would signify which prescriptions were part of the Dr. Baker deal, (Tr. 138), and that Glover would sometimes participate in client meetings where they would say that USC has a "consulting vet" and that if the client's veterinarian did not prescribe omeprazole fenbendazole, they "could do it in house," *i.e.* at USC using the Dr. Baker deal, (*id*. at 140). Hopkins testified that Glover confirmed to him that USC "had been paying Dr. Baker . . . for sales that were generated through the trainer Baker program" whereby "Sam's sale force was . . . solicit[ing] trainers and the trainers were . . . plac[ing] orders," allowing USC to "bypass the horse's normal vet." (*Id*. at 849–50, 837.) Glover ignored and sometimes even pushed back against concerns raised by the USC pharmacists regarding the legality of the Dr. Baker prescriptions numerous times, both in-person and over emails to Glover. (*See* Tr. 562–68, 583–87, 596–98, 605–06, 612–13, 617–21, 1146–47, 1149–59, 1165–71, 1178–79, 1251–53; *see also* GX 162, GX 167, GX 170, GX 172–73, GX 214S.)

Glover's attempt to analogize the Government's evidence in his case to *United States v. Defendant(s)*, No. 09-CR-609, 2011 WL 13196436 (C.D. Cal. Jan. 5, 2011), is unavailing. (*See* Mem. 25–26.) As an initial matter, *Defendant(s)* is inapposite because unlike the nurses in *Defendant(s)* who lacked "any knowledge or understanding of [their employer's] billing practices, procedures or requirements . . . or how their employer's [sic] could enrich themselves through this scheme," 2011 WL 13196436 *5, Glover was intimately involved in the origination, continuation, and concealment of the Dr. Baker deal. The nurses in *Defendant(s)* were charged "as aiders and abettors of the health care fraud scheme," because while they "had no role in the

21

preparation of the billing statements submitted to" their employer, the paperwork they prepared was "essential to the scheme because it would be used to support billing statements in the event of a [company] audit." *Id*. at \*1–\*2.  Nonetheless, the court found that "there was insufficient evidence to permit a proper inference, as opposed to speculation and guesswork, that [the nurses] harbored the intent necessary to convict them of conspiracy and health care fraud," *id.* at \*6, because "the record contains no evidence that they had sufficient knowledge of [the healthcare program] billing procedures to know the consequences of their actions here let alone to further the efforts of their employer to cheat the [healthcare] program," *id.* at \*5.

In contrast to the nurses in *Defendant(s)*, Glover was aware, if not integral, to the Dr. Baker deal.  Glover was not a low-level employee with no "knowledge or understanding" of his employer's fraud scheme whose actions inadvertently "further[ed] the efforts of [his] employer," *Defendant(s)*, 2011 WL 13196436, at \*5.  Glover's role is more analogous to the other employees in *Defendant(s)* whose Rule 29 motions the court denied because the evidence provided more than an adequate basis from which a jury could infer that they acted with the "[intent] to further the object of the conspiracy and the scheme to defraud."  *See id*. at \*6.  One of the employees "became familiar with the . . . compensation system and assisted in the performance of quality assurance projects in preparation for audits" and forged signatures to further the object of the conspiracy.  *Id.*  The second employee "admitted in [an] interview that he knew that [the company] was running a large, fraudulent operation and that his activities benefitted the office in that regard," and that admission was corroborated by "the testimony of co-workers who testified that" this employee spoke to them about the billing discrepancy.  *Id*. Like those employees, the evidence provides more than an adequate basis from which a jury could infer that Glover acted with intent to defraud or mislead the FDA and ABOP.  As detailed,

22

*supra*, Glover was aware of the Dr. Baker deal, (*see* GX 122–25, GX 2501–11), was aware of the sham consulting agreement with Dr. Baker to "hide and mask" the kickback payments, (Tr. 833–35), created an initialing system to identify orders under the Dr. Baker deal, (*see id*. at 138), was aware of the complaints by the USC pharmacists who could not verify the omeprazole fenbendazole prescriptions under Dr. Baker's credentials, (*id*. at 562–68, 583–87, 596–98, 605–06, 612–13, 617–21, 1146–47, 1149–59, 1165–71, 1178–79, 1251–53), and was involved in implementing Azova as a "solution," (*id.* at 912–15), to the pharmacists' complaints and regulator scrutiny so that USC could continue the Dr. Baker deal.  Indeed, Glovers' resistance to the USC pharmacists' complaints, including giving them an ultimatum to continue filling prescriptions or quit, (*id*. at 658–60, 1173–79, 1251–54), was preventing and delaying pharmacists from reporting the prescription verification issues to regulators, until one of the pharmacists eventually reported the verification issues and the Dr. Baker deal, (*id*. at 1183).[5]

Thus, the Government presented more than sufficient evidence that Glover knowingly, intentionally, and personally participated in and caused others to participate in the conspiracy to distribute misbranded and adulterated omeprazole fenbendazole, and such evidence amply supported Glover's intent to defraud or mislead the FDA and ABOP.  I find that the evidence is not so lacking that "no rational trier of fact could have found the defendant guilty beyond a

---

[5] Glover also cites three "FDCA prosecutions where the government was able to establish an intent to defraud": *United States v. Purdue Frederick Co.*, No. 1:07-CR-00029 (W.D. Va. May 10, 2007) Doc. 5, *United States v. Hernandez*, No. 0:22-CR-60129 (S.D. Fla. June 15, 2023) Doc. 92, and *United States v. Dailey*, No. 5:18-CR-20751 (E.D. Mich. Jan. 8, 2019), Doc. 11.  (Mem. 40.)  The defendants in those cases pled guilty and thus the cases did not involve Rule 29 motions.  In any event, contrary to Glover's statement that those cases "demonstrate clear evidence of criminal intent" because of the nature of the sold medications and "Glover's case does not," as explained *supra*, I conclude that a rational jury could have properly inferred from the evidence presented that Glover did have the intent to defraud or mislead the FDA and ABOP.  While the omeprazole fenbendazole sold here was not OxyContin that was fraudulently marketed as "less addictive" like in *Purdue*, or "wrong medication, broken or glossy pills, and even pebbles" like in *Hernandez*, or a "powerful psychoactive substance" that was "falsely marketed" like in *Dailey*, (Mem. 40), it was still prescribed without a direct client-patient relationship by a veterinarian that was not seeing the horses.  Thus, it is not unimaginable that the medication threatened the health and safety of the horses who received the prescribed omeprazole fenbendazole.

reasonable doubt." *Reyes*, 302 F.3d at 52.

## IV.   **Conclusion**

For the reasons stated above, Defendant's Rule 29 motion is DENIED.

The Court will hold Defendant's sentencing proceeding on March 20, 2026 at 10:00 a.m.. Defendant's submission is due two weeks prior to the sentencing date, and the Government's submission is due one week prior to the sentencing date.

The Court will direct the Probation Department to prepare a presentence investigation report ("PSR").  Glover's PSR interview will not take place unless defense counsel is present.

The Clerk of the Court is respectfully directed to terminate the pending motion at Doc. 106.

SO ORDERED.

Dated: December 2, 2025
     New York, New York

Vernon S. Broderick
United States District Judge